# KENT LITERARY CLUB OF WESLEYAN UNIVERSITY AT MIDDLETOWN ET AL. *v.* WESLEYAN UNIVERSITY ET AL.
## (SC 20226)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiffs, K Co., the owner of a certain fraternity house on the campus
of Wesleyan University, the local chapter of the fraternity, and a member
of the fraternity, sought, inter alia, injunctive relief and damages from
the defendants, the university, its president, and its vice president for
student affairs, in connection with the university's decision to preclude
the fraternity from allowing its members to reside in the fraternity house.
Following the university's announcement in 2014 that all residential
fraternities on campus would be required to coeducate, and following

---

\* This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices Palmer, McDonald,
D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present
when the case was argued before the court, he has read the briefs and
appendices, and listened to a recording of the oral argument prior to partici-
pating in this decision.

The listing of justices reflects their seniority status on this court as of
the date of oral argument.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

a series of unsuccessful negotiations between the parties to establish
a mutually agreeable coeducation plan, the university notified the plain-
tiffs that fraternity members could no longer reside in or use the frater-
nity house as of the 2015–2016 academic year. A Greek Organization
Standards Agreement (agreement) between K Co. and the fraternity, on
the one hand, and the university, on the other, which was a prerequisite
to allowing the use of the fraternity house for residential purposes,
permitted any party to terminate the relationship for any reason upon
thirty days' notice and required the fraternity to comply with and be
bound by all university rules and policies, which the university could
amend or modify at any time. In their action against the defendants,
the plaintiffs alleged promissory estoppel, negligent misrepresentation,
tortious interference with business expectancies, and violations of the
Connecticut Unfair Trade Practices Act (CUTPA). Following a trial, the
jury awarded K Co. damages. In addition, the trial court issued an
injunction requiring that the university enter into a new agreement with
K Co. and the fraternity, allow the housing of fraternity members in
the fraternity house, and afford the fraternity three years in which to
coeducate. Moreover, the trial court, pursuant to CUTPA, awarded the
plaintiffs attorney's fees and costs. The defendants appealed, raising
various challenges to the trial court's jury instructions, the sufficiency
of the evidence with respect to both liability and damages, and the
award of injunctive relief. *Held*:

1. The trial court improperly declined to instruct the jury, in accordance
   with the defendants' request, that a party cannot prevail on a claim of
   promissory estoppel based on alleged promises that contradict the terms
   of a written contract, as the relationship between the parties was gov-
   erned by a written agreement that allowed the university to terminate
   its arrangement with the plaintiffs without cause upon thirty days' notice
   and the plaintiffs' claims revolved around the contention that the univer-
   sity wrongfully terminated its housing arrangement with them; neverthe-
   less, the trial court was not required to instruct the jury, in accordance
   with the defendants' request, that the principle of promissory estoppel
   applies only when there is no enforceable contract between the parties,
   as the existence of a contract does not create an absolute bar to a
   promissory estoppel claim when that claim addresses aspects of the
   parties' relationship that are collateral to the subject matter, and does
   not vary or contradict the terms, of the written agreement, and, because
   the plaintiffs arguably claimed that the university promised the fraternity
   that, if it took good faith steps to develop a viable coeducation plan, it
   could then allow members to reside in the fraternity house, the trial
   court should have instructed the jury that the plaintiffs' promissory
   estoppel claim is cognizable but only insofar as the plaintiffs alleged
   that the university made promises or commitments that did not alter
   or contradict the terms of the agreement.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

2. The trial court should have instructed the jury as to the legal implications of the parties' agreement in connection with the plaintiffs' CUTPA claim, and its failure to do so entitled the defendants to a new trial on that claim.

3. The plaintiffs, having expressly eschewed any claim that the university modified the parties' agreement, waived any rights thereunder, or breached a provision of that agreement that requires consistent treatment of all residential fraternities on the university's campus, had no legal grounds for contesting the university's unilateral decision not to continue to allow the fraternity to house its members during the 2015–2016 academic year, and, accordingly, the trial court improperly failed to instruct the jury that, in light of the parties' agreement, the plaintiffs could not, as a matter of law, reasonably have relied on any perceived extracontractual promise or representation by the university that the fraternity could continue to house its members during that academic year and beyond.

4. This court having determined that any damages in connection with the plaintiffs' claim for tortious interference with business expectancies should be assessed in terms of net profits, the trial court improperly failed to instruct the jury that it should have subtracted K Co.'s expenses of operating an occupied versus an unoccupied fraternity house from its anticipated lost revenue in order to calculate lost profits; because the most reasonable reading of the jury's damages award was that the award included K Co.'s total anticipated lost revenues for the 2015–2016 academic year, without regard to any savings from expenses it did not incur, the trial court's failure to properly instruct the jury as to the correct method of calculating tortious interference damages resulted in an improper award.

5. The trial court improperly failed to instruct the jury that the parties' agreement limited the defendants' potential exposure to only those losses that K Co. incurred before the termination of the agreement for the 2015–2016 academic year, as a defendant cannot be held liable for tortious interference of business expectancies merely for exercising its legitimate contractual rights, regardless of the motive therefor; moreover, damages, if any were incurred, were available to compensate K Co. for interference with its rights only under the parties' agreement covering the 2014–2015 academic year, as K Co. could not have had any reasonable expectation that the university would continue to facilitate its business with fraternity members after that academic year; accordingly, the trial court's failure to correctly instruct the jury as to the law governing damages that may be recovered for tortious interference with business expectancies required a retrial on that particular claim.

6. The defendants were entitled to a new trial on the plaintiffs' claim of negligent misrepresentation, as the trial court failed to instruct the jury as to the proper measure of K Co.'s losses in connection with that claim; although the plaintiffs testified that they had relied to their detriment on the university's alleged misrepresentations, the plaintiffs made no

Kent Literary Club of Wesleyan University *v.* Wesleyan University

attempt to quantify the costs associated with those representations, and, in light of the evidence and arguments presented at trial, the jury's award was intended to compensate K Co. not for its reliance damages but, instead, for its expectation or benefit of the bargain losses.

7. Because the parties' agreement, which substantially limited the potential scope of the university's liability, did not immunize the university with respect to the plaintiffs' claim that the university had negotiated the renewal of the parties' agreement in bad faith, and because there was sufficient evidence for the jury to have found that the university intentionally misled the plaintiffs during the negotiations, leading them to reasonably rely on its representations that the fraternity could continue to house its members if it agreed to coeducate and simply submitted a basic, preliminary plan to coeducate, when, in fact, the university was secretly determined to terminate its relationship with K Co. in the hope of being able to acquire the property on which the fraternity house was situated, a reasonable jury could have found the defendants liable to that limited extent.

8. The defendants could not prevail on their claim that, because the Federal Trade Commission and the federal courts no longer apply the cigarette rule as the test governing unfair trade practice claims under the Federal Trade Commission Act, and because CUTPA directs the courts of this state to be guided by interpretations given by the Federal Trade Commission and federal courts in construing the federal act, the trial court improperly instructed the jury that it should find that the university committed an unfair trade practice or practices if its conduct violated the cigarette rule; this court concluded that, until such time as the legislature chooses to enact a different standard, the cigarette rule remains the operative standard for unfair trade practice claims under CUTPA; moreover, the current federal standard is applied primarily in the regulatory context, as there is no private right of action under the federal act, unlike under CUTPA, and the current federal standard is less readily administrable by a jury and, therefore, arguably ill-suited for claims asserted under CUTPA.

9. The trial court abused its discretion in issuing an injunction requiring the university to enter into the "same" agreement that it had with other residential fraternities, to allow the housing of members in the fraternity house, and to give the fraternity three years in which to coeducate: the injunction was unenforceable, and, thus, was without legal effect, insofar as the university could terminate the new agreement without cause after giving thirty days' notice, as it reserves the right to do so in the agreements it had with other residential fraternities, and the right to house members in the fraternity house would be extinguished as a result of that termination; moreover, the residential fraternities and the university historically had entered into one year agreements terminable at will by either party, there was no claim that the university agreed to waive or modify this provision of the standard agreement, and, therefore, if the

338 Conn. 189 SEPTEMBER, 2021 193

Kent Literary Club of Wesleyan University *v.* Wesleyan University

trial court intended to bind the university to a three year housing agreement with the plaintiffs by extending the time to coeducate to three years, that aspect of the injunction represented an expansion of the terms of the same agreement the university had with other residential fraternities and was improper.

(*One justice concurring separately*)

Argued May 1, 2019—officially released March 5, 2021**

*Procedural History*

Action to recover damages for, inter alia, the defendants' alleged violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *Domnarski, J.*; verdict for the plaintiffs; thereafter, the court, *Domnarski, J.*, denied the defendants' motions for a directed verdict and to set aside the verdict, issued an injunction requiring the defendants to enter into a certain agreement with the plaintiffs, and rendered judgment for the plaintiffs, from which defendants appealed. *Reversed*; *new trial.*

*Aaron S. Bayer*, with whom was *Benjamin M. Daniels*, for the appellants (defendants).

*Richard J. Buturla*, with whom was *Bryan L. LeClerc*, for the appellees (plaintiffs).

*Opinion*

PALMER, J. This appeal involves a commercial dispute arising in the unique context of an undergraduate housing program. The plaintiffs are Kent Literary Club of Wesleyan University at Middletown (Kent), which owns a Delta Kappa Epsilon fraternity house on the Wesleyan University campus (DKE House); the Gamma Phi Chapter of Delta Kappa Epsilon at Wesleyan (DKE); and Jordan Jancze, who, at the time of trial, was a

** March 5, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Wesleyan student and DKE member.[1] The defendants include Wesleyan University (Wesleyan or the university); Wesleyan's president, Michael S. Roth; and Wesleyan's vice president for student affairs, Michael J. Whaley. Following Wesleyan's September, 2014 announcement that all residential fraternities on campus would be required to coeducate, and following a series of unsuccessful negotiations between the parties to establish a mutually agreeable coeducation plan, Wesleyan notified Kent and DKE that they would no longer be eligible to participate in the university's program housing system as of the 2015–2016 academic year and, therefore, that Wesleyan students no longer could reside in or use the DKE House. In response, the plaintiffs commenced the present action, alleging promissory estoppel, negligent misrepresentation, tortious interference with business expectancies, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and seeking damages, attorney's fees and costs, and injunctive relief. Following a jury trial, the jury returned a verdict for the plaintiffs on all counts and awarded Kent $386,000 in damages. In addition, the trial court, acting pursuant to CUTPA, awarded the plaintiffs $398,129 in attorney's fees and $13,234.44 in costs, and issued a mandatory injunction requiring, among other things, that Wesleyan enter into a new contract with Kent and DKE, resume housing Wesleyan students in the DKE House, and give DKE three years in which to coeducate.

On appeal, the defendants raise various challenges to the judgment, including claims concerning the trial court's jury instructions and the sufficiency of the evidence with respect to both liability and damages. The defendants also contend that the trial court abused its discretion or otherwise acted contrary to law in

---

[1] The case was withdrawn as to two other plaintiffs, Tucker Ingraham and Zac Cuzner, prior to trial.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

awarding the plaintiffs injunctive relief. We conclude that, although there was sufficient evidence for the jury to find the defendants liable, the trial court failed to properly instruct the jury regarding the legal effects of the parties' contract and the proper means of calculating damages.[2] Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

I

FACTS AND PROCEDURAL HISTORY

The relevant facts, which were developed at trial, and procedural history may be briefly summarized as follows. Wesleyan is a small, private, liberal arts university located in the city of Middletown. With a few exceptions not relevant to the present action, Wesleyan requires all undergraduate students to reside on campus, primarily in university owned housing.

The university considers residential life to be an important component of the undergraduate education experience. In lieu of residing in traditional dormitories, students can opt to enter Wesleyan's program housing system and live in a theme house based on shared hobbies, experiences, cultural interests, or identities. Students who wish to live in residential fraternities— there are no residential sororities at Wesleyan—must do so via program housing. During the 2014–2015 academic year, three all-male fraternities, one of which was DKE, operated houses on campus and participated in Wesleyan program housing.

In order to participate in program housing, to have Wesleyan students placed in their house, and to receive those students' housing dollars as rent, Kent and DKE,

_____

[2] Our resolution of the appeal on this ground makes it unnecessary to resolve the parties' other claims. In part VI of this opinion, however, we offer some guidance on issues that are likely to arise again on retrial. See, e.g., *State* v. *T.R.D.*, 286 Conn. 191, 206, 942 A.2d 1000 (2008).

Kent Literary Club of Wesleyan University *v.* Wesleyan University

like the other residential fraternities, were required to enter into an annual Greek Organization Standards Agreement with Wesleyan. Among other things, that contract (1) allows either party to terminate the relationship for any reason upon thirty days' notice, (2) requires the fraternity to comply with and be bound by all university rules and policies, which the university is permitted to amend or modify at any time, (3) requires the university to enforce and apply the provisions of the agreement in a manner consistent with how it treats other residential Greek organizations, and (4) provides that the university's failure to enforce any provision of the agreement shall not be construed as a waiver with respect to any subsequent breaches. In the present action, the plaintiffs have never contended that Wesleyan breached or modified that agreement.

DKE is the local chapter of an international fraternal organization, Delta Kappa Epsilon, whose charter bars local chapters from admitting women as members. DKE has existed as a Greek fraternal organization recognized by Wesleyan since 1867. Kent is a Connecticut, nonstock corporation that is operated by Wesleyan's DKE alumni and has owned the DKE House at 276 High Street, in the center of the Wesleyan campus, since 1888.

In the spring of 2014, following a series of incidents in which young women at Wesleyan claimed to have been raped at other fraternity houses[3] and Wesleyan was named as a defendant in resulting lawsuits, it began to participate in what had become a nationwide debate regarding the role of fraternities on college campuses. Specifically, the administration began to consider whether all-male residential fraternities contribute to sexual assault and harassment, and whether main-

---

[3] No evidence was presented at trial that any female had complained of any improper or offensive treatment by a Wesleyan DKE member or at the DKE House. Nor was any evidence presented that there ever had been a complaint of sexual assault or binge drinking at the DKE House.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

taining such fraternities as program housing options was consistent with the university's prioritizing of gender equity, inclusiveness, and the safety of its female students. At the same time, according to Scott Karsten, a DKE alumnus, the plaintiffs sought to take proactive steps to be in the forefront of Wesleyan's educational effort to combat sexual assault and binge drinking, such as enlisting a physician to give an educational program for DKE members on bystander intervention.

After consulting with various stakeholders and considering various options, Roth announced, on September 22, 2014, that Wesleyan intended to require that residential fraternities become fully coeducational over the next three years. The announcement stated that "women as well as men must be full members and [well represented] in the body and leadership of the [residential fraternity] organization." It further stated that the university "looks forward to receiving plans from the residential fraternities to [coeducate]" and would "work closely with them to make the transition as smooth as possible."

In the months that followed, the parties engaged in a series of negotiations and communications aimed at achieving a mutually agreeable plan for coeducating the DKE House. The parties place very different spins on the nature of those negotiations.

Wesleyan contends that it tried to meet the plaintiffs half way, such as by agreeing to allow DKE to coeducate at the residential level—bringing female residents into the DKE House and giving them equal say in house management and programming—but not at the organizational/membership level, that is, not requiring DKE to accept women as members of the fraternity itself. In the university's view, however, the plaintiffs failed to negotiate in good faith and chose instead to stonewall and delay the negotiations, ultimately via litigation, in

Kent Literary Club of Wesleyan University *v.* Wesleyan University

a calculated effort to outlast the administration and, in particular, Roth's tenure as president.

The plaintiffs, for their part, contend that it was Wesleyan that failed to negotiate in good faith. They argue that Wesleyan recognized at the outset that it would "have to develop goals and benchmarks for 'meaningful coeducation' " but that the university never provided any such goals or benchmarks to the plaintiffs to aid them in drafting an acceptable coeducation plan. They emphasize that they submitted a preliminary coeducation plan for the DKE House on January 5, 2015, that complied with Wesleyan's stated requirements and was more detailed than the plan submitted by Psi Upsilon, another residential fraternity that was permitted to remain in program housing.[4] They argue that Roth never intended to allow them to coeducate solely at the residential level and that, in fact, his coeducation requirement was merely a pretext to sever ties with DKE and to force Kent to sell the centrally located DKE House to the university. Because the jury found for the plaintiffs on all counts, we must assume that the jury found their account, or at least some substantial portion thereof, to be more persuasive.

In any event, February 7, 2015, the date of Wesleyan's annual student housing selection, arrived without an agreement between the parties. Accordingly, on February 13, 2015, Whaley wrote to inform the plaintiffs that Wesleyan was terminating their Greek Organization Standards Agreement, effective June 18 of that year. Since that time, Wesleyan student members of DKE, such as Jancze, have been denied the opportunity to reside in the DKE House or even to use the house for nonresidential purposes, such as for studying and

---

[4] Aside from DKE and Psi Upsilon, the only other two residential fraternities active at Wesleyan at the time were Alpha Delta Phi, which already had coeducated at the membership level, and Beta Theta Pi, which was subsequently suspended and lost its charter due to an unrelated incident.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

chapter meetings. This action effectively rendered the property, which has sat empty, useless to the plaintiffs.[5]

The plaintiffs responded by filing the present action. The operative third amended complaint alleges promissory estoppel, negligent misrepresentation, tortious interference with business expectancies, and various CUTPA violations. These different causes of action encompass several different, overlapping theories of liability. The plaintiffs allege, for example, that Wesleyan (1) falsely reassured them that they would be eligible to remain in program housing under the new policy if they agreed to coeducate at the residential, but not the organizational, level, on which promise they relied to their detriment, such as by taking steps necessary to prepare a residential coeducation plan, (2) failed to honor its promise that DKE would be given three years in which to coeducate if the fraternity satisfied certain criteria, and (3) broke a promise to prospective and incoming freshman students that they would have the opportunity to reside in the DKE House.

The defendants moved for summary judgment, arguing that all of the plaintiffs' claims failed as a matter of law because, among other things, the plain and unambiguous language of the parties' Greek Organization Standards Agreement permitted Wesleyan to terminate its relationship with Kent and DKE for any reason at the end of the 2014–2015 academic year.[6] The trial court, *Aurigemma, J.*, denied the motion, concluding that Wesleyan's contractual right to terminate the Greek Organization Standards Agreement did not preclude a claim that Wesleyan misrepresented that the plaintiffs

[5] The jury declined the defendants' invitation to find that Kent had failed to mitigate its losses by, for example, renting the DKE House to other parties.

[6] With respect to plaintiff Jancze, the defendants argued that his claims were barred by the housing contract that all Wesleyan students sign, which expressly provides that students are not guaranteed to receive a specific housing assignment of their choosing.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

could remain eligible to participate in program housing if they agreed to coeducate solely at the residential level.

The case proceeded to trial in June, 2017, by which time the DKE House had been sitting empty for two full academic years. The jury returned a verdict in favor of the plaintiffs as to all four counts and awarded unspecified damages to Kent in the amount of $386,000. Subsequently, the trial court, *Domnarski, J.*,[7] (1) denied the defendants' motions for a directed verdict, to set aside the verdict, and for remittitur, (2) granted the plaintiffs' motion for attorney's fees and costs, as authorized under CUTPA, in the amount of approximately $411,000, (3) denied the plaintiffs' motion for punitive damages, and (4) granted the plaintiffs' motion for an award of specific performance, issuing a mandatory injunction ordering Wesleyan to enter into a new Greek Organization Standards Agreement with Kent and DKE, and to reinstate the DKE House as a program housing option beginning in the 2018 fall semester. The court rendered judgment in accordance with the jury verdict and its posttrial orders under CUTPA.

The defendants appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the defendants contend that (1) the trial court's jury instructions as to liability and damages were legally incorrect, (2) there was insufficient evidence to support the jury's verdict as to each cause of action, and (3) the trial court abused its discretion or committed legal error in issuing a mandatory injunction requiring that Wesleyan readmit DKE into program housing.[8] Additional facts will be set forth as necessary.

[7] All subsequent references to the trial court are to *Domnarski, J.*

[8] That injunction has been stayed pending the resolution of this appeal.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

## II

## LEGAL OVERVIEW

Because there is a substantial degree of overlap between the plaintiffs' various legal theories, and also among the defendants' various challenges to the verdict, our analysis of the issues presented by this appeal necessarily involves some measure of redundancy. In the interests of streamlining that analysis to the extent possible, we offer the following initial observations, apropos of many, if not most, of the issues in this case.

Wesleyan is a private university. Unless otherwise restricted by law, it is permitted to establish any student housing system that it chooses and to require that Wesleyan students adhere to its housing rules as a condition of matriculation. The flip side of that coin is that Kent, as an outsider to Wesleyan's relationship with its students, has no right or enforceable expectation that *any* Wesleyan students will be permitted to live in the DKE House or have their housing dollars flow to Kent, other than as agreed to by the parties.

The plaintiffs make much of the fact that DKE has been recognized as a fraternal organization at Wesleyan for approximately 150 years and that Kent has owned the DKE House for nearly that long. But that history does not create an enforceable right for Kent to continue to conduct business with Wesleyan or to house Wesleyan students in perpetuity, any more than any other organization or business can insist on maintaining relations with an unwilling, long-term commercial partner after relations have soured and the governing contract has expired.[9] See, e.g., *Guyer* v. *Cities Service Oil*

---

[9] Any expectation by the plaintiffs that they would be entitled to play a perpetual role in the Wesleyan community would have been especially ill-founded in light of the ongoing national debate over the role of fraternities on college campuses and, in particular, the apparent trend toward abolishing Greek systems among Wesleyan's peer institutions. See, e.g., N. Horton, "Traditional Single-Sex Fraternities on College Campuses: Will They Survive in the 1990s?," 18 J.C. & U.L. 419, 422 and n.8 (1992).

Kent Literary Club of Wesleyan University *v.* Wesleyan University

*Co.*, 440 F. Supp. 630, 633 (E.D. Wis. 1977); cf. *United States* v. *Colgate & Co.*, 250 U.S. 300, 307, 39 S. Ct. 465, 63 L. Ed. 992 (1919) ("The trader or manufacturer . . . carries on an entirely private business, and can sell to whom he pleases. . . . A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself . . . ." (Citation omitted; internal quotation marks omitted.)).

What this means is that, if the plaintiffs have any enforceable rights, those rights are grounded, first and foremost, in the parties' contracts. Unfortunately for the plaintiffs, the contracts to which they agreed afford them little recourse in the event that Wesleyan decides not to renew DKE's eligibility for program housing. Both Kent and DKE were signatories to the fraternity's Greek Organization Standards Agreement with Wesleyan, and the university placed students in the DKE House pursuant to the housing contract to which each Wesleyan student accedes. By entering into that agreement, Kent necessarily accepted that its ability to lease its property to Wesleyan students under the auspices of the university's official program housing system could be curtailed at Wesleyan's sole discretion. Just as Kent may freely decide each academic year whether it wishes to continue to rent to Wesleyan students, and DKE may elect whether it wishes to participate as a program housing option, Wesleyan is free to choose, with thirty days' notice and for any reason not prohibited by law, *not* to offer DKE as a program housing option and *not* to permit its students to rent from an outside party such as Kent. Many institutions of higher learning make precisely those choices each academic year.

Of course, the plaintiffs could have brought this case in contract, alleging that Wesleyan breached, or seeking enforcement of, the Greek Organization Standards Agreement. But, importantly, they brought no such claim. Indeed, the plaintiffs repeatedly and expressly

Kent Literary Club of Wesleyan University *v.* Wesleyan University

have eschewed any claims sounding in breach of contract. For instance, they do not contend that Wesleyan's conduct had the legal effect of extending the agreement from a one year term to a three year term, waiving Wesleyan's right to terminate the agreement without cause upon thirty days' notice, or otherwise modifying the agreement.[10]

The plaintiffs' legal theories and the decision of the trial court, rather, are largely predicated on the contention that Wesleyan's allegedly deceptive and misleading conduct was *independently tortious*. The plaintiffs further contend that Wesleyan's conduct gave rise to a separate, supra-contractual, but enforceable, obligation for Wesleyan to continue to conduct business with Kent and to assign students to live in the DKE House.

Undoubtedly, it is possible, under certain limited circumstances, to commit a tort or an unfair trade practice in the context of exercising one's legitimate contractual rights. This may happen, for example, if one party negotiates in bad faith so as to cause the other party reasonably to rely on a false belief that an annual contract will be renewed or extended. To this limited degree, the plaintiffs' claims are cognizable.

Nevertheless, under such circumstances, a party generally cannot recover more in tort than it would have been entitled to recover under the contract. In the present case, the terms of the parties' contract substantially

---

[10] It is noteworthy in this respect that the other residential fraternities, Psi Upsilon and Alpha Delta Phi, which, the plaintiffs contend, received preferential treatment from the university, have continued to enter into Greek Organization Standards Agreements that are freely terminable by either party without cause. There is no indication, then, that Wesleyan's public commitment to support coeducation of the residential fraternities over a three year period has been interpreted as a modification of its contractual rights under the agreement.

limit the scope of Wesleyan's potential liability in tort, as well as the availability of injunctive relief. Prior to September 22, 2014, when Roth first announced Wesleyan's new coeducation policy, the plaintiffs could not, as a matter of law, have held any reasonable expectation that they would be able to insist on continuing to do business with Wesleyan after the end of the 2014–2015 academic year upon the expiration of the Greek Organization Standards Agreement that was then in place between the parties. Further, on February 13, 2015, Wesleyan notified the plaintiffs that it was terminating the parties' contract, effective as of June 18, 2015, the end of the 2014–2015 academic year. By implication, this meant that Wesleyan would not be placing any students in the DKE House during the 2015–2016 academic year. From that time forward, the plaintiffs also could not, as a matter of law, have held any reasonable expectation that they would be able to insist on continuing to do business with Wesleyan, in light of the fact that Kent and DKE's right to house Wesleyan students was grounded entirely in, and limited by, the terms of the Greek Organization Standards Agreement, to which they repeatedly had assented. Wesleyan's potential liability, then, extends only so far as they made misrepresentations regarding the renewal or extension of the contract or otherwise bargained in bad faith between September 22, 2014, and February 13, 2015 (the negotiation period). Kent's potential recovery is likewise limited to any documented costs it accrued during that negotiation period in reliance on Wesleyan's alleged misrepresentations. To the extent that the jury was not instructed accordingly and the damages awarded exceeded those that were proven to occur during the negotiation period in detrimental reliance on Wesleyan's alleged misrepresentations or bad faith conduct, the judgment is not sustainable.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

III

PROMISSORY ESTOPPEL AND
CUTPA INSTRUCTIONS

The defendants' central argument throughout the course of this litigation has been that the parties' Greek Organization Standards Agreement essentially immunizes the university against the plaintiffs' various legal claims. Although a jury instruction on that subject might well have been appropriate as to each of the plaintiffs' four causes of action, the defendants asked the trial court to instruct the jury that the parties' contract barred liability only with respect to the plaintiffs' promissory estoppel and CUTPA claims. Accordingly, we will limit our consideration of the issue to those two causes of action. We conclude that, although the jury instructions that the defendants sought at trial overstated the extent to which the agreement shields Wesleyan from liability, the trial court should have instructed the jury as to the legal import of the agreement. Its failure to do so was reversible error.

A

Procedural History

The following additional procedural history is relevant. Throughout the course of this litigation, the defendants have argued that the agreement shields them from any liability in connection with the plaintiffs' various claims. At the outset, the defendants pleaded seven special defenses, the first of which was that the "[p]laintiffs' claims are barred by the terms of the Greek Organization Standards Agreement, pursuant to which Wesleyan had the right to terminate the [a]greement [upon] thirty [days'] written notice for any reason." Subsequently, in their motion for summary judgment, the defendants argued that all of the "[p]laintiffs' claims fail as matter of law because they are barred by the

plain and unambiguous language of the parties' express contracts.''

In their amended request to charge, the defendants sought the following jury instructions consistent with that position:

''6. Connecticut Unfair Trade Practices Act—Conduct Consistent with Contract Terms.

''In determining whether there was an unfair act or practice, you must take into account the parties' written contracts, including the housing contract and the Greek Organization Standards Agreement . . . . When a party acts consistently with its rights under a contract, its conduct cannot violate CUTPA.

\* \* \*

''8. Promissory Estoppel—Effect of Written Contract.

''The plaintiffs also allege claims based on the legal principle known as promissory estoppel. The principle of promissory estoppel applies only when there is no enforceable contract between the parties. A party cannot prevail on a claim for promissory estoppel based on alleged promises that contradict the terms of a written contract.

\* \* \*

''20. Effect of Parties' Written Contracts.

''As a special defense to the plaintiffs' CUTPA claims, the defendants contend that they acted consistently with the terms of the parties' two written contracts— the housing contract and Greek Organization Standards Agreement . . . . In particular, the defendants point to the following:

\* \* \*

''[T]he [Greek Organization] Standards Agreement allows the parties to terminate upon thirty [days'] prior

Kent Literary Club of Wesleyan University *v.* Wesleyan University

written notice to the other party for any reason. I will instruct you that the ordinary meaning of the language 'any reason' is that the parties may terminate for cause; for no cause; or for a reason that may be considered morally indefensible.

"It is not your function to remake the parties' contracts or to change the terms thereof. You must determine the intent of the parties from the contracts that the parties themselves made and apply the terms of those contracts according to their ordinary meaning. If you find that the defendants acted consistently with the ordinary terms of the parties' contracts, then you must return a verdict in favor of the defendants with respect to the plaintiffs' CUTPA claims.'' (Citations omitted.)

The trial court declined to give the requested instructions and, indeed, gave no instructions whatsoever as to the defendants' first affirmative defense or the legal significance of the Greek Organization Standards Agreement. The defendants took exception to the court's charge, consistent with their requested instructions.

B

Legal Standards

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation [but must be viewed in the context of the overall charge] . . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error.'' (Internal quotation

Kent Literary Club of Wesleyan University *v.* Wesleyan University

marks omitted.) *Kos* v. *Lawrence + Memorial Hospital*, 334 Conn. 823, 837–38, 225 A.3d 261 (2020). In other words, we must "consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 239–40, 694 A.2d 1319 (1997). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." *Pickering* v. *Rankin-Carle*, 103 Conn. App. 11, 14, 926 A.2d 1065 (2007).

With respect to situations in which the challenged instruction failed to address important legal principles but the instruction that the appellant had requested also was not a completely accurate statement of the relevant law, we have offered the following guidance: "As a rule, to entitle a party to a new trial for the refusal of the court to charge as requested, the request should be so framed that the court can properly comply with it. . . . [However] there should be an exception when the request relates to a material and important feature of the case concerning which it is clearly the duty of the court to instruct the jury irrespective of the request. If in such cases the court not only refuses to instruct them as requested, but entirely omits all reference to the subject, thereby leaving the jury to have, and to act [on], erroneous impressions of the law, we think the party is entitled to a new trial, notwithstanding the imperfect manner of making the request." (Internal quotation marks omitted.) *Mei* v. *Alterman Transport Lines, Inc.*, 159 Conn. 307, 311, 268 A.2d 639 (1970); see also *Mack* v. *Clinch*, 166 Conn. 295, 297, 348 A.2d 669 (1974) ("[W]e [are not] limited to the specific question of whether the defendant's request to charge should have been granted. Having been informed of a material and important issue by the request, it was the duty of the court to charge correctly on that subject."). As we

Kent Literary Club of Wesleyan University *v.* Wesleyan University

discuss more fully hereinafter, although the actual instructions that the defendants sought in the present case overstated the extent of their contractual protections, it is clear that the legal significance of the Greek Organization Standards Agreement that governed the parties' relationship was of sufficient import to the plaintiffs' promissory estoppel and CUTPA causes of action that the trial court was obliged to instruct the jury thereon.

C

Instructions Relating to Promissory Estoppel Claim

With these principles in mind, we turn to the defendants' central claim, namely, that the jury should have been instructed that the fact that Wesleyan was contractually permitted to terminate its relationship with DKE and Kent for any reason upon thirty days' notice means that it could not be held liable under a theory of promissory estoppel or under CUTPA for having exercised that contractual right, regardless of the manner in which it chose to do so. We begin with promissory estoppel.

To prevail in a cause of action sounding in promissory estoppel, a plaintiff must convince the jury that (1) the promisor has failed to honor a clear and definite promise that (2) the promisor reasonably should expect to induce detrimental action or forbearance on the part of the promisee or a third person, and (3) the promise does, in fact, induce detrimental action or forbearance in reasonable reliance on the promise. See, e.g., *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). The trial court also must find, as a matter of law, that injustice can be avoided only by enforcement of the promise. See id.; 1 Restatement (Second), Contracts § 90 (1), p. 242 (1981); see also "From the Committee on Standard Civil Jury Instructions," 78 Mich. B.J. 352, 354 (1999) (majority view is that whether injustice can be avoided

Kent Literary Club of Wesleyan University *v.* Wesleyan University

only by enforcement of promise is equitable question that should be determined by trial court as matter of law). The trial court's charge to the jury in the present case was accurate, as far as it went, insofar as it was consistent with these principles.[11]

The extent to which liability under the doctrine of promissory estoppel is precluded by the existence of a contract between the parties also is well established. As a general matter, "[w]hen an enforceable contract exists . . . parties cannot assert a claim for promissory estoppel [on the basis of] alleged promises that contradict the written contract. . . . Put differently, a plaintiff cannot use the theor[y] of promissory estoppel . . . to add terms to [a] contract that are entirely inconsistent with those expressly stated in it." (Citation omitted; internal quotation marks omitted.) *Marino* v. *Guilford Specialty Group, Inc.*, Docket No. 3:14CV705 (AVC), 2015 WL 1442749, *8 (D. Conn. March 27, 2015); see also *In re Pilgrim's Pride Corp.*, 706 F.3d 636, 641 (5th Cir. 2013) (it is unreasonable to rely on alleged promise that purports to extend duration of written contract); *Kuwaiti Danish Computer Co.* v. *Digital Equipment Corp.*, 438 Mass. 459, 468, 781 N.E.2d 787 (2003) (concluding that "[r]eliance on any statement or conduct . . . was unreasonable as a matter of law [insofar as] it conflicted with the qualifying language [in a written document]").

Consistent with these principles, the defendants asked the trial court to charge the jury that "[a] party

---

[11] The court instructed the jury as follows: "The plaintiffs claim that they are entitled to recover based upon a legal principle known as promissory estoppel. For you to find for the plaintiffs under this legal principle, the plaintiffs must establish that (1) the defendants made clear and unambiguous promises, (2) the defendants reasonably should have expected the plaintiffs to take acts in reliance on those promises, (3) the plaintiffs reasonably acted based upon those promises, and (4) enforcement of that promise is the only way to avoid injustice to the plaintiffs."

Kent Literary Club of Wesleyan University *v.* Wesleyan University

cannot prevail on a claim for promissory estoppel based on alleged promises that contradict the terms of a written contract.'' Because the relationship between the parties was governed by a written contract that allowed the university to terminate its arrangement with the plaintiffs without cause upon thirty days' notice and the plaintiffs' claims revolved around the contention that Wesleyan wrongly terminated its housing arrangement with them, the defendants were entitled to such an instruction.

We are not persuaded, however, that the trial court was obliged to give the entire promissory estoppel charge sought by the defendants. The defendants also asked the court to instruct the jury that ''[t]he principle of promissory estoppel applies only when there is no enforceable contract between the parties.'' That is not strictly the law. The existence of a contract does not create an absolute bar to a promissory estoppel claim when that claim addresses aspects of the parties' relationship that are collateral to the subject matter, and does not directly vary or contradict the terms, of the written agreement. See, e.g., *Weiss* v. *Smulders*, 313 Conn. 227, 248–53, 96 A.3d 1175 (2014); see also *Sparton Technology, Inc.* v. *Util-Link, LLC*, 248 Fed. Appx. 684, 690 (6th Cir. 2007), cert. denied, 552 U.S. 1295, 128 S. Ct. 1739, 170 L. Ed. 2d 539 (2008).

In the present case, the plaintiffs arguably made such claims, namely, that Wesleyan promised DKE that, if it took good faith steps to develop a viable residential coeducation plan, it could then remain eligible to participate in program housing under the new policy. As we explain more fully in part III E of this opinion, the plaintiffs' promissory estoppel claim is cognizable, then, but only insofar as they allege that Wesleyan made promises and commitments that did not alter or contradict the terms of the Greek Organization Standards

212 SEPTEMBER, 2021 338 Conn. 189

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Agreement. The trial court should have instructed the jury accordingly.

As we noted, when a proposed charge is largely accurate but either contains inaccurate statements of the law or omits relevant legal principles, the trial court is obliged to accurately instruct the jury on the subject matter of the proposed instruction if the instruction speaks to a material and important feature of the case. There is no doubt that that is true in the present case, as the significance of the Greek Organization Standards Agreement is a central issue and has been the defendants' primary legal defense from the outset.

D

Instructions Relating to CUTPA Claim

For similar reasons, we conclude that the trial court should have instructed the jury as to the legal implications of the parties' contract for the plaintiffs' CUTPA claim, and that its failure to do so entitles the defendants to a new trial on that count. General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Accordingly, to prevail in a private cause of action under CUTPA, a plaintiff must establish that the defendant has (1) engaged in unfair methods of competition or unfair or deceptive acts or practices (2) in the conduct of any trade or commerce,[12] (3) resulting in (4) an ascertainable loss of money or property, real or personal, by the plaintiff. See, e.g., *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 306–307, 692 A.2d 709 (1997). See generally R. Langer et al., 12 Connecticut Practice

---

[12] Because the issue has not been raised, we express no opinion as to whether the provision of student housing by a private university such as Wesleyan is performed in the conduct of its trade or commerce for purposes of CUTPA or is so peripheral to its central educational mission as to fall outside CUTPA's purview.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2020–2021 Ed.) §§ 2.1 through 2.9, pp. 13–111.

Once again, the defendants requested a legally valid instruction—in this case that the jury must take the parties' written contracts into account in deciding whether there was an unfair act or practice—but their proposed instruction overstated the protection that those contracts conferred. Although action in accordance with a party's express rights under a contract ordinarily is shielded from CUTPA liability, liability may attach when, for example, the defendant has acted in bad faith with respect to the contract. 12 R. Langer et al., supra, § 4.3, pp. 423–24, 452–54; see, e.g., *Levitz, Lyons & Kesselman* v. *Reardon Law Firm, P.C.*, Docket No. 3:04cv00870 (JBA), 2005 WL 8166987, *5 (D. Conn. March 31, 2005) (allegations of bad faith efforts to impose modifications to existing contract implicate CUTPA). As was the case with respect to promissory estoppel, the trial court was required to instruct the jury fully and accurately as to the significance of the Greek Organization Standards Agreement in connection with the plaintiffs' CUTPA claim.

E

Wesleyan's Contractual Special Defense

Although the trial court did not specify its reasons for declining to give the defendants' requested instructions, we may assume that the reasons are similar to that on the basis of which the court denied the defendants' pretrial and posttrial motions, namely, that the Greek Organization Standards Agreement did not shield the university from liability. The court reasoned that the plaintiffs' claims were predicated not on an alleged breach of the contract or on Wesleyan's allegedly improper motives for terminating the agreement but, rather, on allegations that Wesleyan misled the plaintiffs

Kent Literary Club of Wesleyan University *v.* Wesleyan University

as to the standards that they would have to meet in order to remain in program housing. The court concluded therefrom that all of the plaintiffs' claims were legally viable, including their claims alleging that Wesleyan had made an enforceable promise that the plaintiffs could remain in program housing for three years while they worked to coeducate the DKE House.

Although the general premises underlying the trial court's reasoning may be true, the conclusion does not follow. Wesleyan had the right, under the parties' contract, to remove DKE from program housing at any time upon thirty days' notice. Wesleyan was free to make that decision for reasons of student safety and gender equity; on the basis of concerns—whether founded or unfounded—that DKE members had engaged or would engage in inappropriate conduct; out of a desire to try to acquire the DKE House; due to Roth's distrust of or inability to work with DKE members or alumni; or for any other reason not prohibited by law. Nor were Roth and other representatives of the university under any *legal* obligation to share with the plaintiffs and the Wesleyan community all of their true reasons and motivations for deciding to part ways with DKE. That is the contract to which the plaintiffs agreed, and the law shall not hear them to complain if Wesleyan chose to exercise its contractual rights in a manner that they did not anticipate or welcome.

It follows that the plaintiffs, having expressly eschewed any claim that Wesleyan modified the one year term of the Greek Organization Standards Agreement, waived any rights thereunder, or breached the provision of the agreement that requires consistent treatment of the various residential fraternities, have no legal grounds for contesting Wesleyan's unilateral decision not to readmit DKE into program housing for the 2015–2016 academic year. Accordingly, in light of the parties' contract, the plaintiffs could not, as a matter

Kent Literary Club of Wesleyan University *v.* Wesleyan University

of law, reasonably have relied on any perceived extra-contractual promise or representation by Wesleyan that their participation in program housing would not be terminated until at least 2018. The jury should have been instructed accordingly.

At the same time, however, as we have explained, the contract does not immunize Wesleyan from the plaintiffs' claims that the university acted in bad faith in the process of *renegotiating* the Greek Organization Standards Agreement for the 2015–2016 academic year. Those claims arise from a novel and distinct question, namely, what coeducation benchmarks the fraternity would have to satisfy in order to remain potentially eligible for participation in program housing beyond 2015. The jury reasonably could have found that that issue was collateral to the 2014–2015 contract. Because the trial court failed to give the jury sufficient guidance as to a central legal issue, the defendants are entitled to a new trial.

IV

TORTIOUS INTERFERENCE AND NEGLIGENT
MISREPRESENTATION INSTRUCTIONS

We next turn our attention to the plaintiffs' tortious interference with business expectancies and negligent misrepresentation claims, and, specifically, the question of whether the trial court correctly instructed the jury with respect to damages. Because the jury was not asked to specify the legal theory pursuant to which it awarded damages to Kent, we must assume, in accordance with the general verdict rule, that the $386,000 in unspecified damages could have been awarded on the basis of any of the plaintiffs' four causes of action. See, e.g., *Goodman* v. *Metallic Ladder Mfg. Corp.*, 181 Conn. 62, 65, 434 A.2d 324 (1980) ("[when] a complaint is divided into separate counts and a general verdict is returned, it will be presumed, if the charge and all

Kent Literary Club of Wesleyan University *v.* Wesleyan University

rulings are correct on any count, that damages were assessed as to that count and the verdict will be sustained'' (internal quotation marks omitted)). We have concluded that a retrial is necessary on the promissory estoppel and CUTPA counts, and, therefore, any award of damages pursuant to those causes of action must be vacated. See part III of this opinion. In this part, we consider whether the jury's damages award can be sustained with respect to tortious interference or negligent misrepresentation.

The following additional procedural history is relevant to the defendants' claim that the trial court failed to instruct the jury correctly as to the law of damages. In their amended request to charge, the defendants sought the following jury instructions:

"16. Damages—Lost Profits.

"With respect to its claim for tortious interference, [Kent] seeks damages for rents that it allegedly would have earned from DKE House. In determining the amount of any damages you award in this respect, you must account for the costs that [Kent] would have incurred in connection with renting DKE House to undergraduate students. [Kent] may only recover damages in an amount equal to the money that it would have earned from renting DKE House, after subtracting the costs it would have incurred in doing so.

"You must also keep in mind that the [Greek Organization] Standards Agreement . . . had a one year term and permitted the parties to terminate upon thirty days' notice for any reason. Wesleyan terminated the [Greek Organization] Standards Agreement on February 13, 2015, effective June 18, 2015. Accordingly, [Kent's] damages are limited to the lesser of its net profits for the (i) thirty day period following termination on February 13, 2015; or (ii) remainder of the one year term covering the time period of February 13, 2015, to June 18, 2015.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

\* \* \*

"17. Damages—Reliance.

"With respect to the plaintiffs' negligent misrepresentation claims, any damages you award should compensate the plaintiffs for losses incurred as a result of relying on the defendants' alleged representations. In other words, the amount awarded should put the plaintiffs in a position they would have been had they not relied on the representations. The plaintiffs must establish the fair and reasonable value of any loss sustained as a result of said reliance." (Citations omitted.)

The trial court declined to give the proposed instructions or to instruct the jury separately as to the different categories of damages that are available under the plaintiffs' various legal theories. Instead, the court gave the following general damages instructions: "The rule of damages is as follows. Insofar as money can do it, the plaintiff is to receive fair, just and reasonable compensation for all losses which are proximately caused by the defendants' conduct. Under this rule, the purpose of an award of damages is not to punish or penalize the defendants for their conduct but to compensate the plaintiff for his resulting losses. You must attempt to put the plaintiff in the same position, as far as money can do it, that he would have been in had the defendant not so acted.

"Our laws impose certain rules to govern the award of damages in any case where liability is proven. Just as the plaintiff has the burden of proving liability by a fair preponderance of the evidence, he has the burden of proving his entitlement to recover damages by a fair preponderance of the evidence. To that end, the plaintiff must prove both the nature and extent of each particular loss for which he seeks to recover damages and that the loss in question was proximately caused by the defendant's conduct. You may not guess or speculate

Kent Literary Club of Wesleyan University *v.* Wesleyan University

as to the nature or extent of the plaintiff's losses. Your decision must be based on reasonable probabilities in light of the evidence presented at trial.

"Once the plaintiff has proved the nature and extent of his compensable losses, it becomes your job to determine what is fair, just and reasonable compensation for those losses.

\* \* \*

"If you find that a party is entitled to damages, that party must prove by a preponderance of the evidence the amount of any damages to be awarded. The evidence must give you a sufficient basis to estimate the amount of damages to a reasonable certainty. Although damages may be based on reasonable and probable estimates, you may not award damages on the basis of guess, speculation or conjecture.''[13]

The jury, having found for the plaintiffs on all counts, awarded Kent unspecified damages of $386,000. During closing arguments, the plaintiffs' counsel asked the jury to award damages to compensate Kent for its lost revenues following the 2014–2015 academic year as a result of Wesleyan's termination of the Greek Organization Standards Agreement, as well as for Kent's costs of having to maintain the uninhabited DKE House since June, 2015. The undisputed testimony of Kent's treasurers as to those losses, which counsel reiterated in closing, was that Kent lost potential gross revenues of $216,000 in the 2015–2016 academic year, and that its costs to maintain the empty DKE House was $170,000 in 2016–2017. The most plausible reading of the trial record, then, is that the jury combined those figures for a total of $386,000. In any event, the plaintiffs failed to proffer any evidence from which the jury could have

---

[13] The court also instructed the jury regarding mitigation of damages and the rule against double recovery of damages.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

calculated damages of that magnitude occurring prior to June, 2015.

## A

## Tortious Interference

Turning our attention first to the tortious interference count, we note that the defendants contend that any damages (1) should be assessed in terms of net profits and (2) must be cabined by the limited liability available under the parties' contract. The plaintiffs respond that the general damages instructions that the court gave provided the jury with sufficient guidance. We agree with the defendants.

## 1

Although other types of damages may be available under appropriate circumstances; see 4 Restatement (Second), Torts § 774A (1), pp. 54–55 (1979); the standard method for calculating damages when a defendant has interfered with a plaintiff's ability to enter into a prospective contract or to reap the benefits of an existing contract is the plaintiff's lost profits, "[t]hat is, what its income *above expenses* would have been with respect to the revenue lost." (Emphasis added; internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 29, 761 A.2d 1268 (2000); see also 4 Restatement (Second), Torts, supra, § 774A, comment (b), p. 55. In the present case, at no time did the trial court instruct the jury that it must subtract Kent's expenses from its anticipated lost revenues in order to calculate the lost profits. There was undisputed testimony from Kent's officers that Kent was running the DKE House on a more or less break even basis, with little or no net profit. Yet, as we have discussed, the most reasonable reading of the damages award is that the jury awarded Kent compensation that included Kent's total anticipated lost *revenues* for the 2015–2016

Kent Literary Club of Wesleyan University *v.* Wesleyan University

academic year. Accordingly, we are compelled to conclude that the trial court's failure to instruct the jury as to the proper method of calculating tortious interference damages resulted in an improper award.[14]

2

We also agree with the defendants that, whether as a matter of damages or of liability, the trial court should have instructed the jury that the Greek Organization Standards Agreement limited the defendants' potential exposure to only those losses—if any—that Kent incurred prior to the expiration of that contract on June 18, 2015. It is the prevailing view that a defendant cannot be held liable in tortious interference merely for exercising its legitimate contractual rights, regardless of its motive therefor. See, e.g., *Omega Environmental, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir. 1997) (under Washington law, equipment manufacturer could not be held liable for tortious interference with business relations when manufacturer merely exercised express

---

[14] We do not mean to suggest that Kent's compensable injuries necessarily were limited to its lost profits. For example, if Kent was responsible for fixed costs, such as building maintenance, insurance, and property taxes for the DKE House, which costs Kent was required to continue to shoulder regardless of whether the house was occupied by paying students, then those costs also were compensable losses. See, e.g., *Hi-Shear Technology Corp.* v. *United States*, 53 Fed. Cl. 420, 444 (2002), aff'd, 356 F.3d 1372 (Fed. Cir. 2004). One would assume, however, that a not insignificant portion of the lost rent would have gone to cover variable costs such as janitorial services, utilities, and the provision of food for the students. The jury should have been instructed that lost revenues that merely would have offset those sorts of variable costs, which Kent did not have to pay while the DKE House sat empty, were not available as damages. To the extent that the jury calculated benefit of the bargain losses using estimates of Kent's lost *gross revenues* for certain years, that was not a valid method of calculating damages because the jury failed to subtract costs that Kent saved as a result of not doing business with Wesleyan. Hypothetically, then, if Kent had spent $50,000 providing food for student residents of the DKE House, and Kent's gross revenues included $50,000 that the students paid to Kent to cover the costs of providing that food, Kent would not be entitled to recover that unspent $50,000 as expectation damages.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

contractual right to cancel distribution agreement), cert. denied, 525 U.S. 812, 119 S. Ct. 46, 142 L. Ed. 2d 36 (1998); *Allen* v. *Oil Shale Corp.*, 570 F.2d 154, 155 (6th Cir. 1978) (trial court properly directed verdict for defendant when petroleum supply contracts were terminable by either party at will); *Hendler* v. *Cuneo Eastern Press, Inc.*, 279 F.2d 181, 184 (2d Cir. 1960) (protection of contractual right in defendant ordinarily justifies interference with another's contract); *Mac Enterprises, Inc.* v. *Del E. Webb Development Co.*, 132 Ariz. 331, 336, 645 P.2d 1245 (App. 1982) (lessor had right to cancel lease of primary tenant and, therefore, was not subject to damages for tortious interference of contract between primary lessee and sublessee); *Florida Telephone Corp.* v. *Essig*, 468 So. 2d 543, 544–45 (Fla. App. 1985) (when contract expressly reserved to defendant right to promptly remove subcontractors' employees from job, defendant was privileged to interfere with subcontractor's relationship with general contractor, regardless of motive); Annot., "Liability for Procuring Breach of Contract," 26 A.L.R.2d 1227, 1259, § 23 (1952) (unqualified contractual right or privilege can be exercised, regardless of motive, without incurring liability).[15]

---

[15] Should the issue arise on remand, we note that the defendants, had they sought one, also would have been entitled to an instruction as to the significant limits that the Greek Organization Standards Agreement placed on Wesleyan's potential liability for tortious interference with the plaintiffs' business expectancies. See part IV of this opinion. Because the issue has not been raised, we need not determine whether the trial court's charge as to the law of tortious interference also was defective because it failed to instruct the jury that, as a general matter, to be liable for tortious interference with business expectancies, a defendant must be an outsider to the business relationship at issue. That is to say, a person cannot tortiously interfere with a contractual arrangement, existing or anticipated, to which the person is a party. See, e.g., *Metcoff* v. *Lebovics*, 123 Conn. App. 512, 520, 2 A.3d 942 (2010); see also *Bai Haiyan* v. *Hamden Public Schools*, 875 F. Supp. 2d 109, 134 (D. Conn. 2012) (under Connecticut law, "[t]here can be no intentional interference with contractual relations by someone who is directly *or indirectly* a party to the contract" (emphasis added; internal quotation marks omitted)).

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Moreover, the plaintiffs were entitled to recover only those damages that were the direct result of the defendants' tortious interference with their reasonable business expectancies. To prevail on such a claim, "it [must] appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit. . . . There must be some certainty that the plaintiff would have gotten the contract but for the fraud." (Citations omitted; internal quotation marks omitted.) *Goldman* v. *Feinberg*, 130 Conn. 671, 675, 37 A.2d 355 (1944); see also *Golembeski* v. *Metichewan Grange No. 190*, 20 Conn. App. 699, 703, 569 A.2d 1157 ("[s]tated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference *resulted from* the defendant's commission of a tort" (emphasis added)), cert. denied, 214 Conn. 809, 573 A.2d 320 (1990).

In the present case, the plaintiffs' claims are predicated on the allegation that Wesleyan had no intention of ever renewing its contract with them. Accordingly, even if Wesleyan had engaged in no misleading or otherwise tortious conduct, and had simply exercised its contractual right to terminate the Greek Organization Standards Agreement in a transparent and straightforward manner, the plaintiffs would have been in no better position with respect to their *future* contractual relations with Wesleyan students after June 18, 2015. Kent could not have harbored any reasonable expectation that Wesleyan would continue to bless and facilitate its business with DKE members after that time. Accordingly, damages, if any were incurred, were available to compensate Kent for interference with its rights only under the 2014–2015 contract.

For all of these reasons, we conclude that the trial court's failure to correctly instruct the jury as to the law governing the damages that a plaintiff may recover

Kent Literary Club of Wesleyan University *v.* Wesleyan University

for tortious interference with its business expectancies requires a retrial on that count. See, e.g., *Herrera* v. *Madrak*, 58 Conn. App. 320, 326, 752 A.2d 1161 (2000) ("[t]he general rule is that [t]he decision to retain the jury verdict on the issue of liability and order a rehearing to determine only the issue of damages should never be made unless the court can clearly see that this is the way of doing justice in [a] case" (internal quotation marks omitted)).

B

Negligent Misrepresentation

At trial, the defendants also sought an instruction that, with respect to the plaintiffs' negligent misrepresentation claim, any damages awarded should be limited to those necessary to compensate the plaintiffs for losses incurred as a result of relying on the defendants' alleged representations. Although the defendants do not expressly reference this instruction in their brief to this court, they make essentially the same argument on appeal in contending that there was insufficient evidence of detrimental reliance to sustain the jury's verdict on the plaintiffs' negligent misrepresentation claim. For the sake of expediency, we address the defendants' claim in the context of the trial court's jury instructions rather than as a challenge to the sufficiency of the evidence.

As a general matter, the damages available to a plaintiff in connection with a claim for negligent misrepresentation are measured by the plaintiff's costs incurred in reliance on the defendant's misstatements and false promises, rather than by the profits that the plaintiffs hoped to accrue therefrom. See 3 Restatement (Second), Torts § 552B (1) (b) and (2), p. 140 (1977) (plaintiff may recover for pecuniary loss sustained in reliance on negligent misrepresentation but recovery does not encompass benefit of plaintiff's contract with defen-

Kent Literary Club of Wesleyan University *v.* Wesleyan University

dant);[16] see also *Bailey Employment System, Inc.* v. *Hahn*, 545 F. Supp. 62, 73 and n.10 (D. Conn. 1982) (restitution is appropriate measure of damages with respect to CUTPA claim predicated on theory of misrepresentation), aff'd mem., 723 F.2d 895 (2d Cir. 1983), and aff'd mem. sub nom. *Hahn* v. *Leighton*, 723 F.2d 895 (2d Cir. 1983); *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 78, 873 A.2d 929 (2005) (damages in negligent misrepresentation action are limited to pecuniary losses caused by justifiable reliance on information at issue); *New London County Mutual Ins. Co.* v. *Sielski*, 159 Conn. App. 650, 662, 123 A.3d 925 (indicating that Connecticut has adopted § 552B of the Restatement (Second) of Torts), cert. granted, 319 Conn. 956, 125 A.3d 533 (2015) (appeal withdrawn June 29, 2016); *Bokma Farms, Inc.* v. *State*, 302 Mont. 321, 325, 14 P.3d 1199 (2000) (loss of anticipated profits was not recoverable because it resulted from lack of enforceable contract, rather than from plaintiff's reliance on defendant's negligent misrepresentations).

In the present case, although the plaintiffs testified that they had relied to their detriment on Wesleyan's alleged misrepresentations, such as by hiring an architect and otherwise preparing for coeducation of the DKE House, they made no attempt to quantify those costs. Rather, it is apparent that, in light of the evidence and arguments presented at trial, the jury's award of damages was intended to compensate Kent not for its reliance damages but, instead, for its expectation, or benefit of the bargain losses. Because the trial court failed to instruct the jury as to the proper measure of Kent's losses in connection with the plaintiffs' negligent

---

[16] We recognize that comment (b) to § 552B suggests that benefit of the bargain damages might be appropriate if a defendant engaged in fraudulent conduct. See 3 Restatement (Second), Torts, supra, § 552B, comment (b), p. 141. For present purposes, we need not determine the applicability or scope of that exception under Connecticut law because the plaintiffs did not allege fraud with respect to their negligent misrepresentation claim.

338 Conn. 189 SEPTEMBER, 2021 225

Kent Literary Club of Wesleyan University *v.* Wesleyan University

misrepresentation claim, a new trial is required on that claim as well.

V

SUFFICIENCY OF THE EVIDENCE

We next consider the defendants' claim that there was insufficient evidence for the jury to find the defendants liable under each of the plaintiffs' four causes of action.[17] Our resolution of the defendants' instructional error claims in parts III and IV of this opinion largely resolves this claim as well. Specifically, although the Greek Organization Standards Agreement substantially cabins the potential scope of Wesleyan's liability, as a matter of law, that agreement does not immunize Wesleyan against the plaintiffs' claim that it negotiated the renewal of the agreement in bad faith.[18] We conclude that there was sufficient evidence for the jury to have found the defendants liable to that limited extent.

At trial, the plaintiffs sought to establish, among other things, that, during the negotiation period, Wesleyan promised them that they would not have to coeducate at the membership level in order to remain eligible to participate in program housing and also that Wesleyan would work with them to develop a viable residential coeducation plan for the DKE House. They further

---

[17] We note that it is the usual practice of this court to address challenges to the sufficiency of the evidence before addressing claims of instructional error, because the former, if successful, generally will entitle the party asserting the evidentiary sufficiency challenge to judgment on the merits, rather than merely a new trial. See, e.g., *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005). Under the unique circumstances of the present case, however, addressing the instructional claims at the outset cuts the shorter path and does not prejudice the defendants.

[18] For the sake of brevity, and because the plaintiffs' various allegations largely overlap and cut across their four causes of action, we discuss the evidence in support of the jury's verdict in general terms, rather than with reference to each specific theory of liability. We express no view as to whether the plaintiffs may prevail at a new trial on their claim for tortious interference of business expectancies. See footnote 15 of this opinion.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

sought to establish that Wesleyan—or at least Roth—never intended to keep any of those promises. Rather, the coeducation plan was, from the start, a pretext to conceal Wesleyan's true intentions, which allegedly were to completely eliminate the residential fraternities, to force Kent to sell the DKE House to Wesleyan, and/or to depopulate the DKE House due to Roth's personal dislike or distrust of DKE. Finally, the plaintiffs sought to establish that they had relied in various ways on Wesleyan's purported false promises and misrepresentations.

Although the plaintiffs' case was hardly overwhelming, construing the evidence in the light most favorable to sustaining the verdict, as we must, we are persuaded that there was sufficient evidence to establish those allegations. The discussion that follows is not a comprehensive list of all of the trial evidence in support of the plaintiffs' various allegations but, rather, merely some examples of the evidence on the basis of which the jury reasonably could have found in favor of the plaintiffs.

With respect to Wesleyan's alleged promises, several witnesses testified that, during a November 20, 2014 meeting, Whaley informed members and representatives of the plaintiffs that DKE would not be required to coeducate its membership in order to remain in program housing. Whaley further represented not only that Wesleyan would work with the plaintiffs to accomplish the residential coeducation of the DKE House, but also that the deadline to fully coeducate the house could be extended, even beyond the three years that Roth had announced, as long as the plaintiffs continued to make substantial progress toward that goal. There was further testimony that a second representative of the university, Wesleyan's vice president of development, Barbara Jan Wilson, offered similar commitments in an e-mail prior to that meeting.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

In addition, in a January 21, 2015 e-mail to representatives of the plaintiffs, Whaley wrote that "Wesleyan is willing to consider DKE for 2015–2016 [p]rogram [h]ousing status if DKE is willing to execute [certain residential coeducation benchmarks] . . . . I stand ready to assist you in any reasonable way so that you can refine your plan to comply with our program housing requirements and remain in program housing for the coming academic year (2015–2016)."

During his trial testimony, Whaley arguably could be understood to acknowledge that Roth, too, had made promises of this sort to the plaintiffs. During Whaley's redirect examination, the plaintiffs' counsel asked him: "Well, when somebody gives their word, and they say you're going to have three years to implement it, you can—like in this case. The president said there's going to be three years to implement coeducation. You take that as a promise from the president, and . . . people could rely on that, right?" Whaley responded: "That was the timeframe that was outlined." Again, on redirect examination, the plaintiffs' counsel asked Whaley about Roth's original, September 22, 2014 coeducation announcement, in which Roth stated that "[t]he university looks forward to receiving plans from the residential fraternities to coeducate, after which it will work closely with them to make the transition as smooth as possible." Again, Whaley could be understood to recognize that the announcement represented a promise made by Roth to the Wesleyan community.

The record also contains evidence from which the jury reasonably could have concluded that those various promises were insincere and that Roth never intended to permit DKE to remain in the program housing system or to assist the fraternity in that process. On December 4, 2014, Whaley sent an e-mail to the plaintiffs reiterating that they could remain eligible for program housing even if they did not coeducate DKE

Kent Literary Club of Wesleyan University *v.* Wesleyan University

as an organization and admit women as full members. While Whaley was continuing to make those representations, however, Wesleying, the Wesleyan student blog, published an interview with Roth in which he appeared to contradict Whaley's promises. Roth was quoted as stating that "there won't be any single sex residential Greek organizations in five years. . . . [I]f they don't have . . . women as equal and full members, then they won't exist [as] residential organizations at Wesleyan." Roth was aware at the time that DKE's national organization barred local chapters from admitting women as members and, therefore, that, unless and until the national organization changed its policy to permit women members, as certain other fraternal organizations had, DKE would be unable to comply with the condition that he had articulated.

There also was evidence from which the jury reasonably could have found that Roth and Whaley were driven by a hostility toward Greek organizations and harbored a desire to eliminate all residential fraternities. Minutes of an April 22, 2014 meeting between the two men, for example, express the opinion that "eliminating Greek organizations would be ideal . . . ."

In addition, there was evidence from which the jury reasonably could have found that Roth was motivated by a personal dislike of DKE and the DKE House in particular. There was testimony that he repeatedly had complained about noise emanating from the house, which is situated directly across from his own residence in the center of the Wesleyan campus. Moreover, during direct examination, Roth acknowledged that, in the past, he was personally offended that certain DKE members had referred to him as a "fascist."[19]

---

[19] Roth testified: "I was offended to be called a fascist. But it's perfectly in their right . . . to call people names . . . as [it] is in our right not to approve such entities for housing our students."

338 Conn. 189       SEPTEMBER, 2021       229

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Finally, there was evidence from which the jury reasonably could have found that Roth never intended to permit the plaintiffs to remain in program housing because he believed that curtailing their access to Wesleyan student renters and, thus, their cash flow, would force them to sell the DKE House to Wesleyan. In a July 17, 2014 memorandum to other Wesleyan administrators, Whaley discussed various options as to the future of residential Greek organizations at the university. One option he outlined was to restrict or terminate the Greek houses. Whaley wrote: "Wesleyan could offer to buy the houses . . . . If we then acquire Greek houses subsequently, we can divest of 100 beds in [dormitories] that are in poor condition—a good thing for the overall housing program!" One month later, on August 20, 2014, Roth wrote to Wesleyan's chairman of the board of trustees, Joshua Boger, that, "[i]f we don't make the [Greek] houses [off limits] to Wesleyan students for social uses, this will be a disaster. . . . If we don't close [down] the houses with the hopes of acquiring them, then we shouldn't go down this road at all." This evidence was consistent with testimony from various DKE alumni that Wesleyan administrators long had coveted the centrally located DKE property and recently had inquired as to whether the DKE House was for sale.

There also was evidence from which the jury could have determined that, during the negotiation period, the plaintiffs relied to their detriment on Wesleyan's false promises and misrepresentations. There was testimony, for example, that, after having been assured that they could remain eligible for program housing without coeducating at the membership level, the plaintiffs began to work with an architect to develop plans for the renovations that would be necessary to accommodate female residents.[20]

---

[20] Whether these allegations are sufficient to establish detrimental reliance or ascertainable/pecuniary loss under each of the plaintiffs' four causes of

Kent Literary Club of Wesleyan University *v.* Wesleyan University

We conclude, then, that there was sufficient evidence for the jury to have found that Wesleyan intentionally misled the plaintiffs during the negotiation period, leading them to reasonably rely on the university's representations that they could remain eligible for program housing if they agreed to coeducate the DKE House and simply submitted a bare-bones, preliminary residential coeducation plan, such as the one submitted by Psi Upsilon, when, in fact, Wesleyan was secretly determined to terminate its relationship with Kent in the hope of being able to acquire the DKE property. We do not suggest that this reading of the record is the most reasonable, or that we would have been persuaded to embrace the plaintiffs' theories if we had been the triers of fact. But we are not prepared to say that no reasonable jury, presented with this evidence, could have so found.[21]

---

action, in the absence of evidence that the plaintiffs compensated their architect financially or made any other financial outlays, is a very close question. At the very least, we think that a jury reasonably could have found that the ascertainable loss element of CUTPA was satisfied. See, e.g., *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 218–19, 947 A.2d 320 (2008) ("[A]scertainable loss . . . may be proven by establishing, through a reasonable inference, or otherwise, that the defendant's unfair trade practice has caused the plaintiff [injury]. . . . The fact that a plaintiff fails to prove a particular loss or the extent of the loss does not foreclose the plaintiff from obtaining injunctive relief and [attorney's] fees pursuant to CUTPA if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff." (Emphasis omitted; internal quotation marks omitted.)); see also *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 641–44, 698 A.2d 258 (1997) (trier of fact reasonably could have inferred that deployment of video cameras facing entrances to exotic dance clubs would have adversely impacted clubs' business so as to satisfy ascertainable loss element of CUTPA); *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981) ("[u]nder CUTPA, there is no need to . . . prove the amount of the ascertainable loss").

[21] The defendants' arguments to the contrary notwithstanding, the plaintiffs' claims are not barred by the statute of frauds, insofar as the plaintiffs' eligibility to remain in program housing for the 2015–2016 academic year was a question that could be—and was—definitively resolved in less than one year following the public and private statements on which the plaintiffs

338 Conn. 189 SEPTEMBER, 2021 231

Kent Literary Club of Wesleyan University *v.* Wesleyan University

VI

ISSUES LIKELY TO ARISE ON REMAND

The defendants have raised various other claims of error. Although some of them need not be addressed at this time, in light of our disposition of the defendants' appeal, we offer brief guidance as to the following two issues, which may be expected to confront the trial court again on retrial: (1) whether the trial court properly instructed the jury as to certain other legal standards that govern a CUTPA claim, and (2) whether the trial court abused its discretion or acted contrary to law in issuing a mandatory injunction requiring that the parties reinstate and maintain their contractual relations for three additional years.

A

Unfair Trade Practices Standard

We first address the defendants' contention that the trial court improperly instructed the jury regarding the definition of unfair trade practices under CUTPA. Consistent with this court's precedent, the trial court instructed the jury that it should find that Wesleyan committed an unfair trade practice if Wesleyan's conduct violated the so-called cigarette rule. The defendants contend that, because the Federal Trade Commission (FTC) and the federal courts no longer apply the cigarette rule as the test governing unfair trade practice claims; see, e.g., *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 123–24 n.46, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019); Connecticut should follow suit and adopt the now prevailing federal standard, the substantial unjustified injury test. We take this opportunity to clarify that,

claim to have relied. See, e.g., *C. R. Klewin, Inc.* v. *Flagship Properties, Inc.*, 220 Conn. 569, 578, 600 A.2d 772 (1991).

Kent Literary Club of Wesleyan University *v.* Wesleyan University

until such time as the legislature chooses to enact a different standard, the cigarette rule remains the operative standard for unfair trade practice claims under CUTPA.

The historical context of this issue is as follows. "[I]n determining whether a practice violates CUTPA we have adopted the criteria [previously] set [forth] in the cigarette rule by the [FTC] for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 880, 124 A.3d 847 (2015). "[T]he cigarette rule . . . standard originated in a policy statement of the [FTC] issued more than one-half century ago . . . and rose to prominence when mentioned in a footnote in *Federal Trade Commission* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972). The decades since have seen a move away from the cigarette rule at the federal level. . . . That move culminated with a revision of the FTC Act by Congress in 1994, which codified the limitations on the FTC's authority to regulate unfair practices. . . . This court has characterized the federal standard for unfair trade practices contained therein as a more stringent test known as the substantial unjustified injury test, under which an act or practice is unfair [only] if it causes substantial injury, it is not outweighed by countervailing benefits to consumers or competition, and consumers themselves

Kent Literary Club of Wesleyan University *v.* Wesleyan University

could not reasonably have avoided it.'' (Citations omitted; internal quotation marks omitted.) *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 123–24 n.46.

As the defendants correctly note, members of this court have, at times, indicated an openness to revisiting the question of whether to abandon the cigarette rule and to adopt the substantial unjustified injury test as the proper standard for unfair trade practices under CUTPA. See, e.g., *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 238–39, 990 A.2d 326 (2010) (*Zarella, J.*, concurring). At the same time, notwithstanding the questions raised in those decisions, we consistently have continued to apply the cigarette rule as the law of Connecticut. E.g., *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, supra, 318 Conn. 880.

In *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 119 A.3d 1139 (2015), we remarked that this court had observed ten years earlier that the cigarette rule is no longer the guiding rule under federal unfairness law but that, in the intervening decade, ''the legislature ha[d] given no indication that it disapprove[d] of our continued use of the cigarette rule as the standard for determining unfairness under CUTPA, notwithstanding the federal courts' abandonment of that rule . . . .'' Id., 622 n.13. In *Artie's Auto Body, Inc.*, we again flagged the issue for the legislature, stating that, ''[b]ecause of the likelihood that this court will be required to address this issue in a future case . . . the legislature may wish to clarify its position with respect to the proper test.'' Id. Five additional years have passed since we issued that invitation, and, still, the legislature has given no indication that it is dissatisfied with our continued application of the more consumer friendly cigarette rule. Accordingly, there now is a powerful argument that the legislature has acqui-

Kent Literary Club of Wesleyan University *v.* Wesleyan University

esced in our ongoing application of that standard. See 12 R. Langer et al., supra, § 2.2, p. 60 (noting that one reason to retain cigarette rule standard is that this court "has applied the current standard for [twenty] years without legislative action to change the standard").

The contrary argument, that we should adopt the current federal standard for unfair trade practices, relies primarily on § 42-110b (b), which provides that "[i]t is the intent of the legislature that in construing subsection (a) of this section, the [C]ommissioner [of Consumer Protection] and the courts of this state shall be *guided by* interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 [U.S.C. §] 45 (a) (1)), as from time to time amended." (Emphasis added.) There are several reasons, however, why § 42-110b (b) does not compel us to adopt the substantial unjustified injury test. First, the current statutory language was added in a 1976 amendment, replacing a provision that stated that "[u]nfair or deceptive acts or practices . . . shall be those practices . . . *determined to be* unfair . . . in rules, regulations or decisions interpreting the Federal Trade Commission Act . . . ." (Emphasis added.) General Statutes (Rev. to 1975) § 42-110b (a); see Public Acts 1976, No. 76-303, § 1. The legislature's apparent purpose in transitioning from the "determined to be unfair" language to the more flexible "guided by" language was to make clear that the Commissioner of Consumer Protection and our state courts are not to be constrained, in applying CUTPA, to find actionable only those practices that have been deemed unlawful under the FTC Act. 12 R. Langer et al., supra, § 2.6, p. 92.

Second, "[w]e have . . . repeatedly looked to the reasoning and decisions of the Supreme Judicial Court of Massachusetts with regard to the scope of CUTPA." *Normand Josef Enterprises, Inc.* v. *Connecticut*

Kent Literary Club of Wesleyan University *v.* Wesleyan University

*National Bank*, 230 Conn. 486, 521, 646 A.2d 1289 (1994). Although the Massachusetts counterpart to CUTPA contains language substantially similar to that of § 42-110b (b); see Mass. Ann. Laws ch. 93A, § 2 (LexisNexis 2012);[22] the courts of that state have continued to define unfair trade practices according to a version of the cigarette rule. See, e.g., *UBS Financial Services, Inc.* v. *Aliberti*, 483 Mass. 396, 412, 133 N.E.3d 277 (2019); see also 12 R. Langer et al., supra, § 2.6 p. 91 n.1. Indeed, Connecticut and Massachusetts are two among sixteen states—out of twenty-eight that prohibit unfair trade practices generally—that continue to apply the cigarette rule, even though a number of those states' unfair trade practice statutes likewise counsel deference to the FTC's interpretations. 12 R. Langer et al., supra, § 2.2, pp. 53–54 and n.128.

One possible reason for this is that the federal standard is applied primarily in the regulatory context—there is no private right of action under the FTC Act—whereas CUTPA and sister state consumer protection laws often must be applied by juries in private consumer actions. See id., pp. 56–58. The substantial unjustified injury test is less readily administrable by a jury and, therefore, arguably ill-suited for state statutes such as CUTPA. See id. In any event, for all the foregoing reasons, we reject the defendants' argument that the trial court improperly instructed the jury as to the first element of a private CUTPA claim. Until such time as the legislature chooses to enact a different standard, the cigarette rule is and will remain the operative standard for unfair trade practice claims under CUTPA.

[22] Mass. Ann. Laws ch. 93A, § 2, provides in relevant part: "(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

"(b) It is the intent of the legislature that in construing paragraph (a) of this section . . . the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5 (a) (1) of the Federal Trade Commission Act . . . ." (Citation omitted.)

Kent Literary Club of Wesleyan University *v.* Wesleyan University

## B

## Mandatory Injunction

Lastly, we consider the defendants' claim that, if their conduct did violate CUTPA, the trial court abused its discretion or acted contrary to law when it issued a mandatory injunction requiring Wesleyan to enter into a new contract with the plaintiffs that allows them again to house Wesleyan students as a program housing option and that affords them three years in which to fully coeducate the DKE House. We agree that, even construing the factual record in a manner consistent with the jury verdict and giving due deference to the trial court's credibility determinations, the injunction issued was not warranted.

The following additional procedural history is relevant to this issue. After the jury returned its verdict in favor of the plaintiffs, the plaintiffs filed a motion in the trial court seeking equitable relief in the form of specific performance. Specifically, they sought an order requiring Wesleyan to include the DKE House as a program housing option and allowing DKE members full access to reside and engage in social activities at the house "as they had prior to [the implementation of Wesleyan's coeducation] policy . . . ." (Internal quotation marks omitted.) The trial court concluded that equitable relief was necessary to make the plaintiffs whole because, among other things, the plaintiffs had participated in Wesleyan's program housing system for many years, other residential Greek organizations had been given three years in which to implement a viable coeducational scheme, and Wesleyan had committed to giving DKE the same opportunity as those other organizations to adapt to the new policy. The court also alluded to the fact that the jury had found that Wesleyan acted arbitrarily, capriciously, or in bad faith.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Consistent with those findings, the court issued the following order: "Kent . . . and DKE are ordered to submit and reaffirm in current form the plan for coeducation of 276 High Street on or before January 15, 2018. . . . Wesleyan . . . is ordered to include the DKE House . . . as an option in its offering of program housing for the . . . 2018 [fall] semester. Kent . . . and DKE, as organizations, and [Wesleyan], are ordered to enter into a Greek [Organization] Standards Agreement, which agreement is necessary to allow Kent . . . and DKE to house Wesleyan students for the 2018 fall semester. Under this order, DKE is not authorized to occupy or utilize the premises at 276 High Street until the start of the 2018 fall semester. Except as provided herein, the agreement is to be the same Greek [Organization] Standards Agreement that Wesleyan enters into with other residential Greek organizations. The Greek [Organization] Standards Agreement to be executed by the parties should contain the same nondiscrimination clause that was previously agreed to by the parties. . . . The court retains jurisdiction to ensure compliance with this order. This order is without prejudice to Wesleyan . . . to enforce its rights under the agreement, subject to its obligations under the agreement." (Citation omitted.)

The trial court provided the following additional "guidance" in the event that further proceedings might become necessary to enforce the order: "The purpose of this order is to place the plaintiffs and [Wesleyan] in the same position they would have been in had Wesleyan accepted the plaintiffs' plan for coeducation . . . when it was submitted to [Wesleyan] in 2015. The three year period for full coeducation of [the] DKE House should begin with the . . . 2018 [fall] semester. It is expected that the plaintiffs will diligently fulfill the obligations they have committed to under their coeducation plan. It is also expected that, as to the plaintiffs, Wes-

leyan will apply the same standards for compliance with the plan of coeducation of residential Greek organizations that it has applied to other similar organizations.'' The court finally noted: ''The order issued herein is not intended to overturn, modify, or thwart Wesleyan's plan of coeducation of residential Greek organizations. To the contrary, in fashioning this relief, the court has sought to provide an instrumentality to bring about compliance with the coeducation plan by all parties.'' The defendants contend that the court's order, as refined and illuminated by the accompanying guidance, is both legally unsound and an abuse of the court's discretion.

The following principles pertaining to injunctive relief govern our review of this issue. As a general matter, ''[t]he granting of [such] relief is within the trial court's discretion. In exercising this discretion, the court must balance the competing interests of the parties . . . and [t]he relief granted must be compatible with the equities of the case.'' (Citation omitted; internal quotation marks omitted.) *Dukes* v. *Durante*, 192 Conn. 207, 225, 471 A.2d 1368 (1984). Specifically, the trial court ''may consider and balance the injury complained of with that which will result from interference by injunction.'' *Moore* v. *Serafin*, 163 Conn. 1, 6, 301 A.2d 238 (1972).

More stringent standards, however, govern the issuance of mandatory injunctions. Unlike a prohibitory injunction—an order of the court that merely maintains the status quo by restraining a party from the commission of some act—a mandatory injunction is a court order that commands a party to perform some affirmative act. E.g., *Tomasso Bros.*, *Inc.* v. *October Twenty-Four*, *Inc.*, 230 Conn. 641, 652, 646 A.2d 133 (1994). ''Relief by way of mandatory injunction is an extraordinary remedy granted in the sound discretion of the court [but] only under compelling circumstances.'' (Internal

Kent Literary Club of Wesleyan University *v.* Wesleyan University

quotation marks omitted.) *Monroe* v. *Middlebury Conservation Commission*, 187 Conn. 476, 480, 447 A.2d 1 (1982); see also *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 270 Conn. 619, 650, 854 A.2d 1066 (2004) ("[m]andatory injunctions are . . . disfavored as a harsh remedy and are used only with caution and in compelling circumstances" (internal quotation marks omitted)), overruled in part on other grounds by *Tremont Public Advisors, LLC* v. *Connecticut Resources Recovery Authority*, 333 Conn. 672, 217 A.3d 953 (2019). Mandatory injunctions are deemed to be "drastic" remedies; *Herbert* v. *Smyth*, 155 Conn. 78, 85, 230 A.2d 235 (1967); because, among other things, they may place the trial court in the undesirable position of having to monitor, construe, and police the parties' private conduct, relationship, and contractual dealings on an ongoing basis. See, e.g., *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, supra, 651 n.22. Those concerns are heightened in a case such as this, which arises in a unique context involving student living arrangements at a private university occurring within a highly charged atmosphere arising from an ongoing local and national dialogue about gender equality and student safety in the higher education setting.[23]

Applying these principles to the present appeal, we conclude that the trial court abused its discretion in issuing an injunction that requires Wesleyan (1) to reinstate the DKE House as a program housing option, (2) to enter into a new Greek Organization Standards Agreement with the plaintiffs, and (3) to afford the plaintiffs three years in which to coeducate. We reach this conclusion primarily because, depending on how the ambiguous terms of the trial court's injunction are interpreted, either the order is unenforceable and,

---

[23] Again, all of this assumes, without deciding, that CUTPA even governs the student housing arrangements of a private university. See footnote 12 of this opinion.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

therefore, a nullity, or it impermissibly expands the terms of the parties' contractual relationship beyond those to which they agreed.

The court's order requires the parties to enter into "the same Greek [Organization] Standards Agreement that Wesleyan enters into with other residential Greek organizations." Those agreements, including ones renewed following Wesleyan's announcement of the new residential coeducation policy; see footnote 10 of this opinion; permit Wesleyan to terminate the relationship without cause upon thirty days' notice. The trial court indicated that its "order is without prejudice to Wesleyan . . . to enforce its rights under the agreement . . . ." Accordingly, the most reasonable reading of the injunction is that, if Wesleyan were required to enter into a new Greek Organization Standards Agreement with the plaintiffs, nothing would bar the university from immediately giving notice of its plan to terminate that agreement, assuming that its officers remain of the belief that they cannot successfully partner with DKE, whether due to personal animus, distrust arising from the present litigation, incompatible visions of residential coeducation, or other reasons.

It is blackletter law that "an injunction will not be granted against a party who can substantially nullify the effect of the order by exercising a power of termination or avoidance." 3 Restatement (Second), Contracts, supra, § 368 (1), p. 195; see also id., § 368, comment (a), pp. 195–96 (injunction is pointless if party may terminate on short notice or if notice period is substantial, such as thirty days or more, but substantial performance cannot be rendered within that period). If the injunction at issue in the present case went into effect today, and Wesleyan immediately exercised its right to terminate and gave the plaintiffs thirty days' notice thereof, the plaintiffs' right to participate in program housing would be extinguished before the commence-

Kent Literary Club of Wesleyan University *v.* Wesleyan University

ment of the next academic semester. Under this interpretation of the trial court's order, then, the injunction is unenforceable and, thus, is without legal effect.

On the other hand, the trial court also provided guidance implying that its order should be implemented as if (1) Wesleyan had accepted the plaintiffs' coeducation plan, (2) the plaintiffs had been afforded three years in which to coeducate, and (3) Wesleyan had agreed to apply the same coeducation standards to DKE as to the university's other residential fraternities. If we understand this guidance to mean that Wesleyan cannot terminate its relationship with the plaintiffs for three years after the order goes into effect, or at least that Wesleyan cannot do so for any currently existing reasons, then the injunction becomes problematic in various other ways. Most of these boil down to the fact that the trial court has imposed a binding, long-term relationship, one requiring ongoing collaboration and cooperation, on parties who, despite their decades long partnership, have never formally chosen to enter into that sort of contractual agreement, and between whom mutual respect and trust have been lost. As we noted, those concerns are heightened in the present case, situated as they are at the intersection of an intense, ongoing debate over gender inclusion, campus violence, and the role of the residential experience in the higher education mission.

"It is axiomatic that courts do not rewrite contracts for the parties." (Internal quotation marks omitted.) *Gibson* v. *Capano*, 241 Conn. 725, 732, 699 A.2d 68 (1997). Accordingly, "it is well settled that we will not import terms into [an] agreement . . . that are not reflected in the contract." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 16, 938 A.2d 576 (2008). In particular, a court may not, to effectuate the parties' ability to achieve their contractual ends, impose orders that

expand or exceed the terms of their agreement. See, e.g., *Nassra* v. *Nassra*, 139 Conn. App. 661, 669, 56 A.3d 970 (2012). In the present case, the residential fraternities and Wesleyan always have chosen to enter into one year contracts terminable at will by either party. As we noted, there is no claim, and the trial court made no finding, that Wesleyan agreed to waive or modify this provision of the contract. Accordingly, if the trial court intended to bind Wesleyan to a three year housing agreement with the plaintiffs, that aspect of the order represented an expansion of the terms of the Greek Organization Standards Agreement and was improper.

An injunction that nullifies Wesleyan's long-standing contractual right to terminate its relationship with the plaintiffs at its sole discretion would be especially troubling in that it would place the university at a decided disadvantage relative to the fraternity. If disagreements arose over coeducation, discipline, or other matters, as they quite likely would, the plaintiffs would remain free to cut ties with Wesleyan as they saw fit, whereas Wesleyan could part ways only with the court's blessing. Enforcing Wesleyan's extracontractual promises in that manner would destroy the mutuality of obligation for which the parties have bargained. See, e.g., *Bower* v. *AT & T Technologies, Inc.*, 852 F.2d 361, 364 (8th Cir. 1988).

The defendants suggest various additional, albeit related, rationales as to why the trial court's issuance of a mandatory injunction was improper. They contend, for example, that the injunction (1) is inconsistent with the limited scope of their potential liability, as cabined by the Greek Organization Standards Agreement, (2) improperly forces hostile, mistrustful parties to enter into a prolonged relationship that will require close, ongoing collaboration on issues ranging from academic programming to student safety, (3) necessitates a

Kent Literary Club of Wesleyan University *v.* Wesleyan University

degree of ongoing judicial supervision over and intervention into the parties' dealings that is plainly disproportionate to any potential benefits to be gained therefrom, and (4) impermissibly intrudes on Wesleyan's academic freedom and responsibility to ensure student safety. Although these arguments may well have merit, we need not address them further at this time in light of our foregoing discussion concerning the impropriety of the injunctive relief issued.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

D'AURIA, J., concurring. I agree with the majority's opinion in full. I write separately only to highlight certain concerns I have that might arise on remand if the plaintiffs, the Kent Literary Club of Wesleyan University at Middletown (Kent), the Gamma Phi Chapter of Delta Kappa Epsilon at Wesleyan (DKE) and Jordan Jancze, succeed on their claims under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and once again seek equitable relief.

The plaintiffs brought this action alleging promissory estoppel, negligent misrepresentation, tortious interference with business expectancies, and violations of CUTPA. Their prayer for relief sought compensatory damages, punitive damages, attorney's fees and costs, and specific performance. As to the CUTPA claims, the plaintiffs alleged that the named defendant, Wesleyan University (Wesleyan), engaged in trade or commerce in two ways. First, they claim that, "by virtue of its advertising of, and its offering for rent or lease, various properties to students as residential housing, which it markets as an integral part of their educational experience," Wesleyan engaged in trade or commerce. In this paradigm, the student plaintiff, Jancze (this is not a

class action), is a consumer of residential housing, and Kent is Wesleyan's "competitor." The plaintiffs also claim that Wesleyan used DKE and promised housing there to students (including athletes) as a way of enticing them to choose to attend Wesleyan but always intended to pull the rug out from under them by denying students DKE housing and requiring students to "reside in more expensive housing" offered by Wesleyan.

Prior to trial, Wesleyan and the other defendants, Wesleyan's president, Michael S. Roth, and its vice president for student affairs, Michael J. Whaley, moved to strike both of the plaintiffs' CUTPA claims and their prayer for relief for specific performance. As to the CUTPA claims, the defendants argued that the plaintiffs failed to allege sufficient facts to establish that the alleged misrepresentations violated CUTPA because the plaintiffs did not allege that the defendants made the misrepresentations with the intent to deceive. The trial court agreed with the defendants and struck the CUTPA claims. The plaintiffs repleaded the CUTPA claims to correct this defect and to include the intent element. The defendants did not file any subsequent motion to strike the repleaded CUTPA claims.

As to the prayer for relief, the defendants argued that none of the alleged causes of action permitted the court to order specific performance requiring Wesleyan to include the DKE House as an option in its offering of program housing. The trial court, however, agreed with the plaintiffs that their claims for *promissory estoppel* supported a prayer for relief of specific performance. Specifically, despite a lack of any controlling case law from this court or the Appellate Court on the issue, the trial court explained that, under breach of contract principles, the plaintiffs may be entitled to specific performance if monetary damages proved inadequate or impracticable, and that this principle applies equally to claims of promissory estoppel.

Kent Literary Club of Wesleyan University *v.* Wesleyan University

Following a trial, the jury returned a verdict in favor of the plaintiffs on all counts and awarded Kent $386,000 in damages. In addition, the trial court, acting under CUTPA, awarded the plaintiffs $398,129 in attorney's fees and $13,234.44 in costs. The plaintiffs then filed a motion in the trial court seeking equitable relief in the form of specific performance solely on the basis of their claim of promissory estoppel. Specifically, they sought an award requiring Wesleyan to include the DKE House as a program housing option and allowing DKE brothers full access to reside and to engage in social activities at the house "as they had prior to [Wesleyan's] 'coeducation' policy . . . ." In neither their prayer for relief nor in their motion for an award of specific performance did the plaintiffs request injunctive relief under CUTPA. The trial court determined that this failure by the plaintiffs did not prevent it from awarding injunctive relief under both CUTPA and the promissory estoppel claims, as the defendants were aware from the beginning of the case that the plaintiffs were seeking specific performance and alleging CUTPA violations.

The trial court issued a mandatory injunction, requiring, among other things, that Wesleyan enter into a new contract with Kent and DKE, resume housing Wesleyan students in the DKE House, and give DKE three years in which to coeducate.[1] The trial court determined that

_____

[1] With respect to the injunction, the court issued the following order: "Kent . . . and DKE are ordered to submit and reaffirm in current form the plan for coeducation of 276 High Street [the location of the DKE House] on or before January 15, 2018. . . . Wesleyan . . . is ordered to include the DKE House . . . as an option in its offering of program housing for the . . . 2018 [fall] semester. Kent . . . and DKE, as organizations, and [Wesleyan], are ordered to enter into a Greek [Organization] Standards Agreement, which agreement is necessary to allow Kent . . . and DKE to house Wesleyan students for the 2018 fall semester. Under this order, DKE is not authorized to occupy or utilize the premises at 276 High Street until the start of the 2018 fall semester. Except as provided herein, the agreement is to be the same Greek [Organization] Standards Agreement that Wesleyan enters into with other residential Greek organizations. The Greek [Organization] Standards Agreement to be executed by the parties should contain

Kent Literary Club of Wesleyan University *v.* Wesleyan University

injunctive relief was necessary for the plaintiffs to obtain the full measure of justice under both their CUTPA claims and their promissory estoppel claims because, among other things, DKE and Kent had participated in Wesleyan's program housing system for many years, other residential Greek organizations had been given three years in which to implement a viable coeducational scheme, and Wesleyan had committed to providing DKE the same opportunity as those other organizations to adapt to the new policy. The court also alluded to the fact that the jury had found that Wesleyan acted arbitrarily, capriciously, or in bad faith. Yet, the trial court declined to award punitive damages, which, under CUTPA, are for the court to award in its discretion. See General Statutes § 42-110g (a) ("[t]he court may, *in its discretion*, award punitive damages" (emphasis added)).

This court's ultimate conclusion in the present case that a new trial is warranted on all claims, including

the same nondiscrimination clause that was previously agreed to by the parties. . . . The court retains jurisdiction to ensure compliance with this order. This order is without prejudice to Wesleyan . . . to enforce its rights under the agreement, subject to its obligations under the agreement." (Citation omitted.)

The trial court provided the following additional "guidance" in the event that further proceedings might become necessary to enforce the order: "The purpose of this order is to place the plaintiffs and [Wesleyan] in the same position they would have been in had Wesleyan accepted the plaintiffs' plan for coeducation . . . when it was submitted to [Wesleyan] in 2015. The three year period for full coeducation of [the] DKE House should begin with the . . . 2018 [fall] semester. It is expected that the plaintiffs will diligently fulfill the obligations they have committed to under their coeducation plan. It is also expected that, as to the plaintiffs, Wesleyan will apply the same standards for compliance with the plan of coeducation of residential Greek organizations that it has applied to other similar organizations.

\* \* \*

"The order issued herein is not intended to overturn, modify, or thwart Wesleyan's plan of coeducation of residential Greek organizations. To the contrary, in fashioning this relief, the court has sought to provide an instrumentality to bring about compliance with the coeducation plan by all parties."

Kent Literary Club of Wesleyan University *v.* Wesleyan University

CUTPA, means it is entirely possible that the question of a mandatory injunction might not reoccur on remand. The parties might litigate the case very differently on remand, or it is possible the plaintiffs will not prevail on their CUTPA counts, obviating the need for the trial court or an appellate court to consider such an injunction. Because I consider central to this appeal the scope of the injunction that the trial court entered after trial, I believe it warrants comment in this unique case, lest the trial court on remand construe our not reaching the question of its propriety as suggesting tacit approval.

I find the injunction that the trial court entered problematic for multiple reasons. First, as the trial court noted, neither this court nor the Appellate Court ever has determined whether the remedy of specific performance is available in a promissory estoppel case in which there are no allegations of an underlying contract. I do not address this issue, however, because, even if specific performance is a permissible remedy under promissory estoppel, the injunction at issue went well beyond ordering specific performance. Specific performance "requires precise fulfillment of a legal or contractual obligation . . . ." Black's Law Dictionary (11th Ed. 2019) p. 1686 (specific performance is "[t]he rendering, as nearly as practicable, of a promised performance through a judgment or decree; specif[ically], a court-ordered remedy that requires precise fulfillment of a legal or contractual obligation when monetary damages are inappropriate or inadequate"). Here, the trial court did not merely order Wesleyan to fulfill the precise terms of the alleged promises but went beyond those terms and ordered it to enter into a three year contractual relationship with DKE. For this reason, I do not believe the scope of the injunction was proper under the promissory estoppel claim. My view is bolstered by the plaintiffs' counsel's concession at oral argument before this court that the better argument for the source

Kent Literary Club of Wesleyan University *v.* Wesleyan University

of authority for the injunction, if there is one, is under CUTPA, not promissory estoppel.

My remaining concerns involve the issuance of the injunction under CUTPA. Initially, I note that I am not convinced that the plaintiffs' request for specific perfor- mance under the promissory estoppel claims placed the defendants on notice that the plaintiffs were seeking an injunction under CUTPA. The purpose of specific performance differs greatly from the purpose of equita- ble relief under CUTPA—the former, as discussed pre- viously, requires the parties to fulfill their promised obligations exactly as stated; the latter, as I will discuss in more detail, seeks to remedy the allegedly unfair or deceptive practice or method of competition.

But even if the defendants were on notice of the plaintiffs' request for equitable relief under CUTPA, and assuming that there is a cognizable CUTPA claim to begin with, I question the scope of the injunction in this case—specifically, whether the injunction actually serves to eliminate or to compensate for the allegedly unfair or deceptive trade practices. Because the case is remanded for a new trial, I do not need to address in detail the propriety of the scope of the injunction at issue under CUTPA. Nonetheless, in the event that the plaintiffs succeed on their CUTPA claims, I wish to note my significant concerns over the scope of this injunction.

I recognize that CUTPA affords plaintiffs broad reme- dies beyond simple monetary damages, including attor- ney's fees, punitive damages, and injunctive and other equitable relief. See, e.g., *Marinos* v. *Poirot*, 308 Conn. 706, 712–13, 66 A.3d 860 (2013). Further, this court has yet to clarify to what extent the general rules governing injunctions apply to injunctions issued under CUTPA, but I have no reason to believe that these general princi- ples do not apply in this context, with one exception I will discuss. To be entitled to injunctive relief, "[a] party

Kent Literary Club of Wesleyan University *v.* Wesleyan University

seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . [I]n exercising its discretion, the court . . . may consider and balance the injury complained of with that which will result from interference by injunction.'' (Internal quotation marks omitted.) *Wallingford* v. *Werbiski*, 274 Conn. 483, 494, 877 A.2d 749 (2005). ''[T]he relief granted must be compatible with the equities of the case.'' (Internal quotation marks omitted.) *Dukes* v. *Durante*, 192 Conn. 207, 225, 471 A.2d 1368 (1984). ''[I]t may be inequitable to grant an injunction which would cause damage to the defendant greatly disproportionate to the injury of which the plaintiff complains [especially if] . . . the judgment went beyond the relief to which the plaintiff was entitled under the statutes.'' (Citations omitted.) *DeCecco* v. *Beach*, 174 Conn. 29, 35, 381 A.2d 543 (1977); see *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 240–41, 919 A.2d 421 (2007) (holding that injunction is overly broad under Connecticut Unfair Trade Secrets Act, General Statutes § 35-50 et seq., if it protects information that is not trade secret).

Unlike other statutes, the CUTPA statutes do not provide that ''[i]n such actions the court shall follow the rules and principles governing the granting of injunctive relief.'' General Statutes § 35-34; cf. General Statutes § 42-110g (d). See generally R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2020–2021 Ed.) § 6.9. Moreover, this court specifically has explained that, to be entitled to injunctive relief under CUTPA, a plaintiff need not establish that no adequate alternative remedy exists and that the injury is irreparable. See *Fairchild*

*Heights Residents Assn.*, *Inc.* v. *Fairchild Heights*, *Inc.*, 310 Conn. 797, 805 n.6, 82 A.3d 602 (2014). Like injunctive relief in general, however, injunctive relief under CUTPA is entrusted to the trial court's discretion. See General Statutes § 42-110g (d) ("the court may, *in its discretion*, order, in addition to damages or in lieu of damages, injunctive or other equitable relief" (emphasis added)). "[D]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to [serve] and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians*, *P.C.*, 298 Conn. 371, 392, 3 A.3d 892 (2010). Thus, although the general requirements of irreparable harm and lack of an adequate remedy at law need not be satisfied to entitle a plaintiff to injunctive relief under CUTPA, I believe that the general rule that, in ordering injunctive relief, the trial court must consider and balance the equities of the case so that the injunction is not disproportionate to the injury at issue still applies. Even under CUTPA, the injunctive relief must be tailored to the alleged harm and not go beyond the relief to which the plaintiff is entitled under the statute.

Two trial level cases support my conclusion. In *Bristol Technology*, *Inc.* v. *Microsoft Corp.*, 114 F. Supp. 2d 59, 95–96 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the defendant challenged both the plaintiff's entitlement to injunctive relief under CUTPA, arguing that the plaintiff had failed to establish irreparable harm, as well as the scope of the injunction. Judge Janet C. Hall of the United States District Court for the District of Connecticut, applying state law, held that the plaintiff did not have to establish irreparable harm to be granted injunctive relief. Id. Nevertheless, the court noted that the scope of the injunctive relief had to be "no broader than necessary to cure the effects of the harm caused by the violation . . . . Injunctive

Kent Literary Club of Wesleyan University *v.* Wesleyan University

relief should be narrowly tailored to address specific harms and not impose unnecessary burdens on lawful activity. . . . [The] court must exercise its discretion in framing an injunction that is reasonably designed to prevent wrongful conduct. . . . The court should grant injunctive relief only in conformity with the spirit of the law, and in a manner to [serve] and not to impede or defeat the ends of substantial justice.'' (Citations omitted; internal quotation marks omitted.) Id., 97. Because the plaintiff was seeking injunctive relief under CUTPA for allegedly deceptive trade practices, the court concluded that ''[t]he injunctive relief in this case should be designed to eliminate [that] deception.'' Id., 98.

More recently, then Judge Bright similarly explained that, even if a plaintiff is entitled to injunctive relief under CUTPA, ''the injunction must be narrowly tailored to address only the conduct that violates the statute.'' *State* v. *Tracey's Smoke Shop & Tobacco, LLC*, Superior Court, judicial district of Hartford, Docket Nos. CV-11-6024334S and CV-11-6024337S (February 24, 2012) (*Bright, J.*) (53 Conn. L. Rptr. 594, 601). According to Judge Bright, although the trial court has discretion to determine the scope of the injunction, ''[s]uch relief should be narrowly drawn to the circumstances of the case.'' Id., 600. Judge Bright applied these principles in a sovereign enforcement action in which the state alleged that the defendant, a tobacco shop, became a cigarette manufacturer when its employees assisted customers in the operation of the filling stations that allowed customers to roll their own cigarettes, thus violating General Statutes § 4-28m (b) (2), which constituted a CUTPA violation under § 4-28m (d). Id., 599–600. Judge Bright disagreed with the state that the plaintiff should be enjoined from using the filling stations under any and all circumstances; rather, Judge Bright ruled that, under CUTPA, the state was entitled to a more narrow

Kent Literary Club of Wesleyan University *v.* Wesleyan University

injunction enjoining the plaintiff from conduct only to the extent that it was acting as a tobacco product manufacturer. Id., 600.

I agree with the admonitions of the courts in both *Bristol Technology, Inc.*, and *Tracey's Smoke Shop & Tobacco, LLC*, that an injunction issued under CUTPA must be properly tailored to vindicate the alleged CUTPA violation. In the present case, on remand, to the extent that the plaintiffs establish their CUTPA claims, the trial court, in exercising its discretion to grant injunctive relief under CUTPA, must consider and balance the equities of the case so that the injunction (1) is not disproportionate to the injury at issue, and (2) does not go beyond the relief to which the plaintiffs are entitled under CUTPA. In considering these factors, I emphasize that the purpose of CUTPA as a whole "is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices." (Internal quotation marks omitted.) *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 616–17, 440 A.2d 810 (1981). This does not give the trial court carte blanche to fashion any injunctive relief it might wish to fashion, even on the basis of a jury finding of arbitrary, capricious, or bad faith conduct. Although such conduct might justify punitive damages, which are available under CUTPA but which the trial court chose to deny in the present case, it does not allow the trial court to craft equitable relief that exceeds the scope of the alleged CUTPA violation.

I have difficultly seeing how the injunction the trial court entered after trial vindicates the alleged CUTPA violations. For example, in counts one and two of the operative complaint, the plaintiffs alleged that the defendants violated CUTPA as to DKE members and the individually named student plaintiff, Jancze, on the ground that Wesleyan marketed its residential housing by emphasizing its " 'diversity of housing options,' "

Kent Literary Club of Wesleyan University *v.* Wesleyan University

including the opportunity for upperclassmen to select the DKE House, and used this marketing to recruit athletes but intentionally failed to disclose that Wesleyan had the unilateral ability to eliminate the DKE House as a housing option, and, intending not to deliver on those representations, thereby deceived consumers—the prospective students. The deceptive practice at issue is that of deceiving prospective students about the possibility of the DKE House being available as a housing option. The injunction does not address this allegedly deceptive practice. It does not require the defendants to disclose Wesleyan's unilateral ability to control its residential housing options. Rather, it *requires* that the DKE House be a housing option. Not only does this not eliminate the deceptive practice, but it does not remedy the alleged injustice. Because Jancze likely is no longer a Wesleyan student, given the time that has passed since trial, the injunction mandating that Wesleyan and Kent enter into a three year contract does not provide him any remedy. The same goes for other DKE members who might claim to have been deceived by the defendants, as the DKE House has not been an option since the 2015–16 academic year.

Additionally, in counts seven through nine, the plaintiffs alleged that the defendants violated CUTPA as to Kent on the ground that Wesleyan engaged in trade or commerce by advertising and leasing residential housing to students; that Wesleyan was a competitor of Kent in the market for student housing; and that the defendants engaged in unfair methods of competition by intentionally misrepresenting the criteria that Kent would have to satisfy for the DKE House to remain a housing option. Similarly, in counts ten and eleven, the plaintiffs alleged that the defendants violated CUTPA as to DKE on the ground that Wesleyan engaged in trade or commerce by advertising and leasing residential housing to students, including members of DKE,

and that the defendants engaged in unfair or deceptive practices by intentionally misrepresenting the criteria that the members of DKE would have to satisfy for the DKE House to remain a housing option.

The injunction the court entered, however, does not actually seek to police the student housing market or to promote competition in that market. It does not seek to eliminate the allegedly unfair practices and methods of competition—i.e., the alleged marketing misrepresentation. Rather, it forces the parties into a continued contractual relationship. Although this may seem at first glance to be an equitable remedy, attempting to put the plaintiffs in the position they would have been in but for the misrepresentations, in my view, it is a disproportionate remedy. Prior to the injunction, Wesleyan was not required to permit students to live off campus and, under the Greek Organization Standards Agreement, could terminate the agreement for any reason. But the injunction forces Wesleyan not only to allow off-campus housing but to enter into a contract with Kent and DKE requiring the DKE House to be a housing option.[2]

As the court is remanding this case for a new trial regardless of the propriety of the scope of the injunction, I recognize that we need not decide whether the injunction was properly tailored to vindicate the alleged

___

[2] I note that there is at least some ambiguity in the trial court's posttrial injunction and guidance regarding the required duration of the imposed contractual relationship. Although the trial court's posttrial injunction states that the parties are to enter into "the same Greek [Organization] Standards Agreement that Wesleyan enters into with other residential Greek organizations," implying that the thirty day termination provision still applies, the trial court did not clarify how this provision would interact with its order that the DKE House has three years to coeducate. If the DKE House has three years to coeducate, it is unclear whether Wesleyan could terminate their court-mandated contractual relationship before the end of three years for bad faith conduct during the coeducation process, for conduct unrelated to the coeducation process, or for any reason at all, as it could under the previous consensual contract.

CUTPA violations. Rather, I merely raise this issue in this unique trade practices action to emphasize that, in the event that the plaintiffs succeed on their CUTPA claims and request equitable relief, the trial court should look closely at the remedies afforded by the legislature under CUTPA and choose those that vindicate that act and not some other causes of action. I respectfully concur.

————————————————